[No. S002131. L.A. 32206. Oct. 31, 1989.]

EDWARD WILLIAMS, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY,
Respondent;
THE PEOPLE, Real Party in Interest.

738

**COUNSEL**

Madelynn Kopple, Frank O. Bell, Jr., State Public Defender, and Donald L.A. Kerson, Deputy State Public Defender, for Petitioner.

Fenwick, Davis & West, Mitchell Zimmerman and Sally M. Abel as Amici Curiae on behalf of Petitioner.

No appearance for Respondent.

Kent S. Scheidegger and Charles L. Hobson as Amici Curiae on behalf of Respondent.

Ira Reiner, District Attorney, Harry B. Sondheim, Donald J. Kaplan and George M. Palmer, Deputy District Attorneys, for Real Party in Interest.

John K. Van de Kamp, Attorney General, Gary R. Hahn, John R. Gorey and Shunji Asari, Deputy Attorneys General, Cecil Hicks, District Attorney (Orange), Michael R. Capizzi, Chief Assistant District Attorney, William W. Bedsworth and Franklin L. Carroll, Deputy District Attorneys, De Witt W. Clinton, County Counsel (Los Angeles), Richard E. Townsend, Deputy County Counsel, and Christopher N. Heard as Amici Curiae on behalf of Real Party in Interest.

## OPINION

**PANELLI, J.**—The issue in this case is whether jury selection procedures in Los Angeles County violate a criminal defendant's right to an impartial jury, that is, a jury representative of a cross-section of the community. Specifically, we must decide whether, for purposes of cross-section analysis, "community" is defined as the county, the superior court ("judicial") district, or an area extending 20 miles from the courthouse. As explained hereafter, we conclude that the appropriate definition of community for cross-section analysis is the judicial district.[1]

Edward Williams (defendant) is charged with the first degree murder of Bruce Horton. Defendant is Black; Horton was White. The crime occurred in the West Superior Court District of Los Angeles County (West District); trial was scheduled for that district's superior court, located in Santa Monica.[2]

Defendant moved to quash the venire on the ground that Black persons on jury panels in the West District were unconstitutionally underrepresentative of the Black population of Los Angeles County. Defendant sought transfer of the case to either the Central District in downtown Los Angeles or the South Central District in Compton, where a greater number of Blacks could reasonably be expected to appear in the venire.

At the hearing on the motions, defendant called Raymond Arce, Director of Juror Services for Los Angeles County, who testified that since 1981 the county has used its list of registered voters and the Department of Motor Vehicles list of licensed drivers to compile a master list of eligible jurors for both the superior and municipal courts. Arce testified that Black persons presumptively eligible to serve as jurors comprise 11.4 percent of the total county population; in the West District, 5.6 percent of the total population are Blacks presumptively eligible to serve as jurors.[3] A survey of jurors in the Santa Monica courthouse for the three-month period preceding defendant's trial indicated that 4.5 percent appearing for jury duty were Black.

Arce also described the Bullseye System, a computer program used by the county for assigning jurors: Although an eligible juror may be assigned

---

[1] We note at the outset that this case presents no issue concerning the requirement of a jury of the vicinage. In a companion case filed on this day (*Hernandez* v. *Municipal Court, ante,* page 713 [263 Cal.Rptr. 513, 781 P.2d 547]), we hold that boundaries of the county define the vicinage.

[2] Pursuant to the provisions of Government Code sections 69640-69650, Los Angeles County has been divided into 11 superior court or judicial districts.

[3] Arce estimated that Blacks comprise over 11.4 percent of the Central District jurors and approximately 25 percent of the South Central District jurors.

to virtually any superior or municipal court in the county, the program assigns the prospective juror to the court nearest the juror's residence. If that court does not require jurors, the juror is assigned to the next nearest courthouse in need of jurors. If that court is located over 20 miles from his residence, the juror is informed that, under Code of Civil Procedure section 203, he has a right to be excused.[4]

Defendant did not argue that the percentage of Blacks on his jury panels was unfair in relation to the percentage of Blacks within the West District or within a 20-mile radius of its courthouse. He argued only that Blacks were underrepresented on the panels in relation to the percentage of Blacks within the entire county.

The trial court denied defendant's motions. The court found the county's jury selection procedure to be "fair and reasonable" and further stated: "It appears . . . that Los Angeles County is making a reasonable and good faith effort to meet the constitutional requirements here. [¶] In any event, there is no showing of any significant underrepresentation of a cognizable group based on the figures presented here."

Defendant then filed a petition for writ of prohibition and/or mandate in the Court of Appeal. The Court of Appeal denied the petition and agreed with the trial court's finding that defendant had not made the required prima facie showing of systematic underrepresentation. Significantly, however, the Court of Appeal held that a criminal defendant in Los Angeles County, in order to establish systematic underrepresentation of a distinctive group, must show that representation of the group is not fair and reasonable in relation to the percentage of such persons residing within a 20-mile radius of that particular courthouse.

*Representative Jury—Cross-section of Community.*

■ In California, the right to trial by a jury drawn from a representative cross-section of the community is guaranteed equally and independently by the Sixth Amendment to the federal Constitution (*Taylor* v. *Louisiana* (1975) 419 U.S. 522, 530 [42 L.Ed.2d 690, 698, 95 S.Ct. 692]) and by article I, section 16 of the California Constitution. (*People* v. *Wheeler* (1978) 22 Cal.3d 258, 272 [148 Cal.Rptr. 890, 583 P.2d 748].)

Representative cross-section analysis developed as a response to the pernicious practice of eliminating identifiable groups from the jury pool, thus

---

[4] After we granted review in this case, the Legislature repealed former section 203. (Stats. 1988, ch. 1245, § 1.)

preventing them from being considered as petit jurors. (See, e.g., *Duren* v. *Missouri* (1979) 439 U.S. 357, 364-368 [58 L.Ed.2d 579, 586-590, 99 S.Ct. 664]; *Ballard* v. *United States* (1946) 329 U.S. 187, 193-194 [91 L.Ed. 181, 185-186, 67 S.Ct. 261] [women]; *Taylor* v. *Louisiana, supra,* 419 U.S. at p. 530 [42 L.Ed.2d at p. 698]; *Peters* v. *Kiff* (1972) 407 U.S. 493, 503-504 [33 L.Ed.2d 83, 94-95, 92 S.Ct. 2163] [Blacks]; *Thiel* v. *Southern Pacific Co.* (1946) 328 U.S. 217, 220 [90 L.Ed. 1181, 1184-1185, 66 S.Ct. 984, 166 A.L.R. 1412] [wage earners]; *Glasser* v. *United States* (1942) 315 U.S. 60, 84-85 [86 L.Ed. 680, 706-707, 62 S.Ct. 457] [women not members of League of Women Voters]; *People* v. *White* (1954) 43 Cal.2d 740, 749 [278 P.2d 9] [blue-collar workers].) Petit juries selected from these pools lacked the broad spectrum of attitudes and beliefs shared by members of the excluded groups.

■ It is well settled that no litigant has the right to a jury that mirrors the demographic composition of the population, or necessarily includes members of his own group, or indeed is composed of any particular individuals. (*People* v. *Wheeler, supra,* 22 Cal.3d at p. 277; *People* v. *White, supra,* 43 Cal.2d at p. 749; *People* v. *Hines* (1939) 12 Cal.2d 535, 539 [86 P.2d 92].) What the representative cross-section requirement does mean, however, is that a litigant "is constitutionally entitled to a petit jury that is as near an approximation of the ideal cross-section of the community as the process of random draw permits." (*People* v. *Wheeler, supra,* 22 Cal.3d at p. 277.)[5]

Defendant argues that his right to a jury panel drawn from a representative cross-section of the community is abridged by the jury selection procedures in Los Angeles County. Defendant cites the testimony of Raymond Arce (*ante,* pp. 739-740) that Blacks comprise 11.4 percent of the countywide, juror-eligible population. Defendant did not argue that the jurors called in his case were not representative of the juror-eligible Black population of the West District, which Arce testified averaged 5.6 percent in the three months preceding defendant's trial. In fact, Blacks comprised 8.6 percent of the jurors appearing for defendant's case.

■ Under *Duren* v. *Missouri, supra,* 439 U.S. 357, in order to establish a prima facie violation of the fair cross-section requirement, "the defendant must show (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from

---

[5]The fair cross-section principles set forth in *Wheeler* were codified by the Legislature in 1980. As amended in 1988, section 197, subdivision (a), requires in part that jurors be selected "at random, from a source or sources inclusive of a representative cross section of the population of the area served by the court." Section 204 (former section 197.1) prohibits exclusion from jury service "by reason of occupation, race, color, religion, sex, national origin, or economic status, or for any other reason."

which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." (*Id.* at p. 364 [58 L.Ed.2d at p. 587]; *People* v. *Harris* (1984) 36 Cal.3d 36, 50 [201 Cal.Rptr. 782, 679 P.2d 433].)

We are not concerned with the first prong of the *Duren* test for the People concede that Blacks are a cognizable, distinctive group for purposes of fair cross-section analysis. (*People* v. *Harris, supra,* 36 Cal.3d 36, 51; *Hovey* v. *Superior Court* (1980) 28 Cal.3d 1, 20, fn. 45 [168 Cal.Rptr. 128, 616 P.2d 1301].)

■ To meet the second prong of the *Duren* test, defendant must show that Blacks were underrepresented in jury venires in relation to the number of such persons in the community. Before this court can evaluate the statistical showing of underrepresentation made by defendant, however, we must first determine what community the jury venire must fairly represent. It is here that we confront the central issue of this case.

Defendant argues that community is defined as the entire county. The People argue that community means the judicial district. As noted, the Court of Appeal rejected both definitions, preferring instead a provocative compromise that defines community as that area within a 20-mile radius of the courthouse.[6] Inasmuch as the basis for the decision of the Court of Appeal has been eliminated, no purpose is served by an extended discussion of the propriety of using the 20-mile-radius community in determining the population for cross-section analysis.[7] We turn, instead, to the arguments of the People and defendant who, respectively, propose the judicial district and county. We conclude that the judicial district best serves the constitutional and statutory considerations at issue in the determination of the appropriate community for cross-section analysis as well as the practical problems posed by a far-flung megapolis—Los Angeles County.

---

[6] The Court of Appeal found support for its definition of community in the provisions of the Code of Civil Procedure relating to jurors (§ 190 et seq.), especially section 203 which provided that persons listed for service as trial jurors "shall be fairly representative of the population of the area served by the court, and shall be selected upon a random basis. . . . In counties of more than one court location, the rules shall reasonably minimize the distance traveled by jurors. In addition, in the County of Los Angeles no juror shall be required to serve at a distance greater than 20 miles from his or her residence." Section 203 has been repealed in the Trial Jury Selection and Management Act, Statutes 1988, chapter 1245.

[7] Suffice it to say that the appellate court found evidence of legislative intent to make particular provisions for the jury draw in Los Angeles County in the provision that ". . . no juror shall be required to serve at a distance greater than 20 miles from his or her residence." Given the plain language of the statute, however, we may infer that the 20-mile-radius provision was simply intended to facilitate jury convenience by giving jurors an elective exemption if they resided outside the 20-mile radius.

### ■ *County as Community.*[8]

Defendant contends that the relevant community is the county. In *O'Hare* v. *Superior Court* (1987) 43 Cal.3d 86 [233 Cal.Rptr. 332, 729 P.2d 766], we addressed the issue whether the Sixth Amendment entitled a defendant to a venire drawn from, and representative of, the entire county. We squarely held that it does not.

O'Hare was to be tried on a felony charge in the North County Branch of the San Diego Superior Court, which drew its jurors from an area limited by the boundaries of the North County Municipal Court Judicial District. O'Hare complained that the limited venire contained a significantly lower percentage of jury-eligible Blacks than did the county as a whole.

We held that "the constitutional cross-section requirement is a procedural and not a substantive requirement" (*O'Hare, supra,* 43 Cal.3d at p. 100) and found no constitutional limitation on the government's power to define the "community" against which the demographics of the venire is measured. The drafters of the Sixth Amendment intended there should be no limitation on the legislative power to define the boundaries of the federal district from which jurors in criminal trials are drawn. (See *Williams* v. *Florida* (1970) 399 U.S. 78, 96 [26 L.Ed.2d 446, 458, 90 S.Ct. 1893].) Most significantly, as stated in *O'Hare,* the federal courts have approved the constitutionality of juries drawn from *subdivisions* of districts against challenges that the venire did not match the demographics of the districtwide community. (*United States* v. *Gottfried* (2d Cir. 1948) 165 F.2d 360, 364; *United States* v. *Florence* (4th Cir. 1972) 456 F.2d 46, 49.) Based on the foregoing authorities, we concluded in *O'Hare* that the Sixth Amendment imposes no limitation on the legislative definition of community for the cross-section requirement: "What the Sixth Amendment does guarantee to every defendant, regardless of his personal characteristics, is a jury drawn from a venire from which no member of the local community was arbitrarily or unnecessarily excluded." (43 Cal.3d at p. 101.)

Albeit in another context, in *People* v. *Harris,* Justice Mosk noted the balkanized nature of Los Angeles County and the "significant deceptiveness" of the use of countywide statistical data. (36 Cal.3d at p. 73.) "Our code uses the term 'area served by the court' (Code Civ. Proc., § 197), not

---

[8] The definition of community (no matter what it is) establishes a standard of comparison, not a method of selection. Jurors, selected from a countywide draw, will serve at various courthouse locations and with varying frequencies depending on where they reside in the county, no matter what method is used to determine the representativeness of the resulting jury venires. Cross-section analysis does not address *where* the jurors are sent to serve, but rather examines the relevant community for determination of its *composition.*

the county in which the court is situated. It takes only a cursory knowledge of the demography of Southern California to realize that Long Beach courts serve an area completely distinct in population characteristics from the totality of Los Angeles County. . . . Figures for the entire County of Los Angeles are not only irrelevant but in this instance significantly deceptive."

*Judicial District as Community.*

 Having concluded that there is no constitutional limitation on the Legislature to create a relevant community for cross-section purposes, we must determine whether in creating superior court (or "judicial") districts in Los Angeles County, the Legislature intended to define community in that county as the judicial district where the case is tried.

Sections 69640-69650 of the Government Code, enacted in 1959, set out the guidelines for the creation of superior court districts in Los Angeles County. Of particular relevance to this case are sections 69641,[9] 69643,[10] 69644,[11] and 69645.[12]

The considerations that prompted the legislation shed some light on the goals sought to be achieved. Following World War II and the population explosion in California, in 1957 the Legislature created the Joint Judiciary Committee on the Administration of Justice (Joint Committee) to deal with the urgent need to improve judicial efficiency in the Los Angeles metropolitan area. At the time, the backlog of cases in Los Angeles County Superior Court was particularly acute, having doubled from 6,300 cases in 1952 to 14,700 in 1958.

In the period from 1923 through 1957, a series of legislative enactments ("branch court" bills) had enabled cities to obtain branch courts. To check the proliferation of Los Angeles County one-judge branch courts, the Legislature in 1953 and again in 1957 passed laws increasing the mandatory minimum distance between a projected new court of an otherwise eligible

---

[9] Section 69641 reads: "The board of supervisors of any county, which has a population of not less than 4,000,000 as determined upon the basis of the last preceding census taken under the authority of the Congress or the Legislature, by ordinance may divide such county into not more than nine superior court districts within which one or more sessions of the superior court shall be held."

[10] Section 69643 reads: "Whenever the board of supervisors finds that changes in population make necessary or expedient the change of boundaries of any district, the change of, addition of, or elimination of any location at which sessions of the superior court are to be held, or the creation of new districts, it may make such changes by ordinance."

[11] Section 69644 reads: "An ordinance creating or changing the boundaries of any district shall not result in any district having an estimated population of less than 250,000."

[12] Section 69645 reads: "An ordinance creating additional districts shall not result in more than 11 districts in the county."

city and the nearest city that had an existing branch court. By 1959, only the 14-mile rule of the 1957 legislation was holding back the flood of otherwise mandatory courts in the Los Angeles area. (Joint Com. Rep., at p. 28.)

The Joint Committee did not encounter objections to the branch courts as such; rather, objections focused on the legislative formulas for their creation. The branch court system, the Joint Committee was told, should be replaced by a system of courts located by districts based on population, need, and convenience, regardless of city boundary lines. Consistent with this view, the Los Angeles County Board of Supervisors recommended the development of branch superior court operations "according to a master plan, in the interest of service and economy."

The Joint Committee, in turn, recommended the enactment of legislation "authorizing the Board of Supervisors of Los Angeles County to divide the county into 9 or 10 superior court districts, with power to designate, with the approval of the judges, one or more locations in each district for the holding of court sessions." (Joint Com. Rep. at p. 33.) Senate Bill No. 992, authorizing the creation of such districts in Los Angeles, unanimously passed the Legislature in 1959. The bill was codified as sections 69640-69650 of the Government Code. (Stats. 1959, ch. 1371, § 1, p. 3642.)

While the Legislature did not explicitly designate the superior court districts as communities for the purpose of assessing the representativeness of jury panels, the considerations that prompted creation of the districts in the first place—the practical realities of the county's unique demographics, its geographical expanse, and the need for judicial efficiency—convince us that the Legislature intended that the districts serve as the community for determination of jury impartiality. In a sense, the districts were to be microcosms of an entity—the Los Angeles Superior Court—that had become unmanageable and inefficient as a single unit.

The code sections relating to the establishment of superior court judicial districts and the sections relating to jury selection and management are easily harmonized. Read together, the statutes manifest an unmistakable legislative intent that the courts of the district serve the population within its boundaries.[13] Use of the superior court judicial district as the appropriate "community" in Los Angeles County effectuates this legislative purpose.[14]

---

[13] Although the statutes no longer contain an express provision prescribing that local rules shall minimize distance traveled by jurors in the county (Code Civ. Proc., former § 203), Code of Civil Procedure, section 204 provides for exemption for undue hardship which implies that distance traveled by jurors is to be a consideration in their selection.

[14] Although the instant case does not involve municipal court juries, we note that our definition of "community" for purposes of cross-section analysis in superior courts is equally

Having defined the community which the jury venires must fairly represent, we return to the second prong of the *Duren* test which the defendant must satisfy to establish a prima facie violation of the fair cross-section requirement. The defendant must show that the representation of the excluded group in venires from which juries are selected is not "fair and reasonable in relation to the number of such persons in the community." (*Duren* v. *Missouri, supra,* 439 U.S. at p. 364 [58 L.Ed.2d at p. 587].)

Defendant challenged the jury venires as underrepresentative of the Black population of Los Angeles County. At no time did he argue that the percentage of Blacks on the jury panels in the West District was unfair in relation to the percentage of Blacks in the jury-eligible population of the West District. Accordingly, defendant has failed to show that the representation of Blacks in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community.

Finally, absent a finding of underrepresentation, we do not reach the third prong of *Duren*, i.e., whether the "underrepresentation is due to systematic exclusion of the group in the jury selection process." (*Duren, supra,* 439 U.S. at p. 364 [58 L.Ed.2d at p. 587].)

CONCLUSION

The judgment of the Court of Appeal is affirmed. The Court of Appeal is directed to remand the cause to the West Superior Court District for trial.

Lucas, C. J., Eagleson, J., Kaufman, J., and Arguelles, J.,* concurred.

**KAUFMAN, J.**—I concur fully in the decision and opinion of the majority authored by Justice Panelli. I write separately to respond to the concurring and dissenting opinion penned by Justice Broussard (hereafter the dissent). Justice Broussard, apparently frustrated at his inability to persuade a majority to his view, implies that a majority of the members of this court are insensitive to problems of racial and ethnic discrimination, and in a series of decisions have embarked upon an agenda of diminishing the constitutional rights of minority residents of this state. His frustration may be understandable, but his attack on the motives and integrity of the other members of the court is unjustified, improvident and wholly unworthy of him.

applicable to trial in the municipal courts in Los Angeles County. The Legislature has made it clear in section 200 of the Code of Civil Procedure that municipal courts in Los Angeles County are to use the same jury pool as the superior court.

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairperson of the Judicial Council.

Today's decisions in this case and *Hernandez* v. *Municipal Court, ante,* page 713 [263 Cal.Rptr. 513, 781 P.2d 547], and the other decisions criticized by the dissent are not and were not based on racial considerations at all, much less racial discrimination. They represent reasoned and reasonable resolutions of procedural problems, adopting rules that will afford trial courts the discretion they require to operate the trial court system and conduct criminal trials in a fair yet expeditious manner. Several of the decisions, basically unrelated, reject arguments based on an unwarranted distrust of the trial judges and public prosecutors of our state that this court should adopt ever more impossibly complex standards of review for appellate courts and procedural rules that would continue to ensnare our criminal courts, trial and appellate, in protracted, resource-consuming proceedings having little to do with guilt or innocence or ultimate justice in the particular case. We should have learned from the experience of the past that justice is not achieved by rules and procedures which sound perfect in theory but are unworkable in practice.

In the specific case of jury selection procedures, this means that while the defendant must be afforded a reasonable opportunity to demonstrate invidious or systematic exclusion of members of a cognizable group, a showing of some underrepresentation at a given time is not enough. Neither the venire nor the jury need mirror the racial, ethnic, or religious composition of the community. Once the jury has been fairly selected, the law assumes that its members, whether Black, White, Hispanic, Catholic, Jew, rich or poor, are equally capable of representing the entire community. The right to trial by a jury of one's peers does not mean and has never meant that a Black defendant is entitled to be tried by Blacks or a White defendant by Whites. Nor does the right to trial within the vicinage mean that a defendant who commits a crime in Watts has the right to be tried in Watts or that a crime committed in Beverly Hills must be tried in Beverly Hills.

No member of this court, and no thoughtful person in this country today, can be ignorant of the powerful and corrosive force of racism. Nor is there any disagreement on the goal we all seek: a society in which no advantage or disadvantage results from an individual's race, religion, sex, or ethnic background. There is, however, an emotionally charged debate raging in this country regarding the best means to reach this common goal. According to some, we should eliminate all forms of racial criteria and use only race-neutral procedures. According to others, past wrongs can be redressed and subtle forms of discrimination rooted out only by the use of racial preferences and a heightened race consciousness, hopefully, benign.

It is my personal view that heightened race consciousness and utilization of criteria preferring one race over another, no matter how well intentioned,

will in the long run be counterproductive to the common goal and will tend to perpetuate racial bias and hostility. But as justices it is not our function in judicial decisions to take sides in this acrimonious debate, although from time to time we are presented with cases which impinge on some aspect of it. References to the supposed purposes, beliefs, convictions or intentions of other justices, however, are no more than ad hominem attacks and should play no part in the opinions of any member of the judiciary. Refraining from such tactics has been a cherished tradition of this court; it pains me deeply that Justice Broussard now appears to cast this tradition aside.

This is not a matter merely of etiquette or decorum. Forceful and reasoned dissents are, of course, valuable tools in the shaping of the law. But attacks on the purposes and assumed intent of one's colleagues destroy the collegiality essential to the proper functioning of an appellate court, and undermine the public respect and confidence so essential to the rule of law. It would be well remembered that each of us, and indeed every judge of this state, took an oath to uphold the Constitutions of the United States and the State of California and that each of us is as equally devoted to fulfilling that oath as any other.

**BROUSSARD, J.,** Concurring and Dissenting.—

I.

I agree, under compulsion of *O'Hare* v. *Superior Court* (1987) 43 Cal.3d 86 [233 Cal.Rptr. 332, 729 P.2d 766], that in determining whether a jury is representative of the "community," each superior court district in Los Angeles County is a separate "community." But although it does not do so explicitly, the majority opinion is intended to go further, and to decide that the community which is relevant is that of the district where the case is finally tried.[1] In my opinion, the relevant district should include the place where the crime occurred. But since *Hernandez* v. *Municipal Court, ante,* page 713 [263 Cal.Rptr. 573, 781 P.2d 547], will permit a case to be tried anywhere in Los Angeles County, even in a district remote from the place of the crime, the decisions filed today threaten to eviscerate the right to a representative jury. Defendant will retain a right to a jury representative of

---

[1] On page 744, *ante*, the majority say that "we must determine whether in creating superior court (or 'judicial') districts in Los Angeles County, the Legislature intended to define community in that county as the judicial district *where the case is tried*." (Italics added.) After several pages of analysis, none of which distinguishes between the district where the crime was committed and the district where the case was tried, the majority conclude that use of "the superior court judicial district as the appropriate 'community' in Los Angeles County effectuates this legislative purpose." (P. 745, *ante*.) The majority opinion never directly states that by "judicial district" it means that judicial district where the case was tried.

some community, but that community is not determined by an objective fact—the place of the crime—but by the decision of the state.

Such a rule opens obvious possibilities of forum shopping, since the prosecution can often determine the place of trial by choosing where to file charges. It also presents the danger that the court, for its own convenience, may transfer a case to a remote district unrelated to the crime. It thus threatens to undermine the defendant's right to a jury representative of the community, for that right is meaningless if the community can be changed to suit the preference of the prosecutor or the convenience of the court. Such dangers can be avoided if we recognize that the defendant has more than a right to a jury representative of someplace or other; he has a right to a jury representative of the community where the crime was committed.

This conclusion finds support in the decision of the Alaska Supreme Court in *Alvarado* v. *State* (Alaska 1971) 486 P.2d 891. Defendant was accused of raping a girl near Chignik, an Aleut Indian village in Alaska's third judicial district about 450 miles from the district courthouse in Anchorage. The jury was selected from people residing within 15 miles of Anchorage. This selection method did not exclude Native Americans as such, since many lived in Anchorage, but it did exclude almost all those living in villages in the hinterland, thus significantly altering the racial composition of the jury.

In finding that defendant was denied his right to a representative jury, the court reasoned that "the traditional starting point for determining the community from which jurors are to be selected is the scene of the alleged offense. Hence . . . in determining whether the source from which a given jury is selected represents a fair cross section of the community, we must adhere to a notion of community which at least encompasses the location of the alleged offense. It is the community in which the crime was committed that the jury must represent." (486 P.2d at p. 902.)

The federal district court in *State of Maryland* v. *Brown* (D.Md. 1969) 295 F.Supp. 63, 83, reached a similar conclusion. *Brown* found that a change of venue at the instance of the prosecution did not violate a defendant's constitutional rights, provided that the trial jury was not selected in a manner which arbitrarily excluded residents of the jurisdiction in which the crime was committed.[2]

---

[2] We relied on *Alvarado* and *Brown* for our decision in *People* v. *Jones* (1973) 9 Cal.3d 546 [108 Cal.Rptr. 345, 510 P.2d 705], where we declared that a defendant's right to a jury of the vicinage entitled him to a jury which includes residents of the district where the crime occurred. The majority opinion in *Hernandez* v. *Municipal Court, supra, ante,* at page 724, criticizes that reliance on the ground that the primary issue in both *Alvarado* and *Brown* was

The foregoing reasoning does not mean that the jury must be selected only from the immediate vicinity of the crime. What it means is that the jury must represent a community that includes the place of the crime. The *Alvarado* jury was unconstitutional because it was racially unrepresentative of any defined community which included Chignik. By the same token, Los Angeles Superior Court must be representative of a community defined as the entire county, or any part of the county which includes the place of the crime. A defendant's right to a representative jury must mean a jury representative of the community where the crime was committed, not some other community selected for the advantage or convenience of the state.

## II.

This is the latest of a series of recent decisions in which this court has discussed the right to a representative jury, and thus a suitable time to review those decisions as a whole.

The first to be filed was *People* v. *Johnson* (1989) 47 Cal.3d 1194 [255 Cal.Rptr. 569, 767 P.2d 1047], which concerned the prosecution's use of peremptory challenges to remove minority members from the jury. Prosecutors will generally attempt to justify such challenges by pointing to individual characteristics of the challenged jurors. Our prior decisions recognized that the most effective way to test the truth of those statements is to see if the prosecutor also challenged nonminority jurors with similar individual characteristics. (*People* v. *Trevino* (1985) 39 Cal.3d 667 [217 Cal.Rptr. 652, 704 P.2d 719].) *Johnson,* however, overruled *Trevino,* depriving the appellate courts of the most effective way to review a trial judge's decision upholding the challenges.

*Johnson* went on to state in dictum that the poor do not constitute a cognizable class (47 Cal.3d at p. 1214), which in context means that the prosecution may systematically exclude poor persons from a jury. That conclusion seems to be contrary to the United States Supreme Court decision in *Thiel* v. *Southern Pacific Co.* (1946) 328 U.S. 217 [90 L.Ed. 1181, 66 S.Ct. 984, 166 A.L.R. 1412], which held that the state could not systematically exclude economic groups from jury service. Then, in an astonishing footnote, *Johnson* suggests that although Blacks and Hispanics may not be excluded from juries, Asians and Jews may. (47 Cal.3d at p. 1217, fn. 3.) If a prosecutor wants a 17th century jury of Christian freeholders, the Constitution, if interpreted as suggested in *Johnson,* is no barrier.

cross-section representation, not vicinage. Let us then restore these precedents to their proper place, as authority for the proposition that a jury must represent a community which includes the district of the crime.

The next case, *People* v. *Morales* (1989) 48 Cal.3d 527 [257 Cal.Rptr. 64, 770 P.2d 244], concerned exclusion of minorities from the jury venire. The majority held that a statistical sample of 3,600 jurors was too small to prove systematic exclusion, even though statistical experts testified without dispute that the sample was sufficient to prove the point with a risk of error of only 1 in 1,000. (See pp. 578-579, dis. opn. of Broussard, J.) *Morales* further stated that a defendant could not show a constitutional violation by proving that a facially neutral practice had the effect of excluding a cognizable class. (*Id.* p. 546.) What this means is that the state cannot expressly exclude Blacks, but it can exclude all persons of characteristic "x" (low income, for example), even if "x" so closely correlates with race that the practice results in disproportionate exclusion of Blacks.

*People* v. *Bell, ante,* page 502 [262 Cal.Rptr. 1, 778 P.2d 129], holds a showing of substantial and continuous underrepresentation of Blacks from a county's juries is insufficient even to put the county to the burden of explaining the underrepresentation. Instead, a defendant must now point to a constitutionally impermissible aspect of the county's jury selection procedure and show that this is the cause of the racial disproportionality. Such a specific showing is beyond the resources of most, if not all, defendants. Moreover, the holding itself assumes that the county, confronted with a showing that something in its method of selecting jurors is having the effect of excluding a cognizable group, has no duty to investigate and correct the system; it may continue to exclude minorities until someone is able to prove the exact cause of the problem.

*Bell, supra,* goes on to speak favorably of the "absolute disparity" test for determining when a defendant has made a prima facie showing of exclusion, and unfavorably of all other tests. (*ante,* at pp. 527-528, fn. 14.) The absolute disparity test measures the disparity as a percentage of total population. (I.e., if Blacks constitute 8 percent of county population, and all are excluded, this is "only" an 8 percent, not a 100 percent, exclusion.) It is the most restrictive of the competing tests, and in practical effect will make it impossible for a defendant to present a prima facie showing on behalf of a minority group which comprises less than 10 percent or so of the community.

Finally, *Hernandez* v. *Municipal Court, supra, ante,* page 713, together with the present case, denies a defendant the right to a jury chosen from, or representative of, the community where the crime was committed; he receives instead a jury representative of such community as the prosecutor or courts select.

This court has an obligation to consider the practical consequences of its decisions. Yet none of these decisions show any awareness of their impact

on the right of a defendant to obtain a jury which is in fact representative of the community and the vicinage of the crime. None show any recognition that racial bias, conscious or unconscious, is or ever was a matter of concern in this state. None show any sensitivity for the minority defendant facing trial before a predominately White jury. To the contrary, the decisions simply seem to assume that judges, jurors, jury commissioners and prosecutors lack any feelings of racial bias. They erect procedural barriers to make it difficult or impossible to prove subtle forms of bias. And they dismantle, step by step, the legal doctrines which have been created over the years to make the right to a representative jury an effective and enforceable right. I have dissented to each of these decisions, and now register my dissent to the ongoing process of undermining the right of the defendant and the community to a truly representative jury.

**MOSK, J.**—I agree in principle with the views of Justice Broussard.