Filed 5/28/13  P. v. Deras CA2/6

### NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JOSE T. DERAS,<br><br>    Defendant and Appellant. | 2d Crim. No. B240067<br>(Super. Ct. No. VA118244-01)<br>(Los Angeles County) |

Jose T. Deras was convicted of beating his nine-month-old child to death and of forcibly sodomizing his wife, the mother of their child.  He confesses the killing to her, to the arresting authorities and confesses to it at his trial.  He contends, however, that the trial court's failure to properly admonish the jury concerning the use of the translation of his statements from Spanish into English constituted reversible error.  We conclude that given the crushing weight of the evidence against him the error, if any, is harmless under any standard.

Jose T. Deras appeals from the judgment following his conviction by jury of second degree murder (Pen. Code, § 187, subd. (a)),[1] assault on a child causing death (§ 237ab, subd. (b)), and sodomy by use of force (§ 286, subd. (c)(2)).  The jury also

---

[1] All statutory references are to the Penal Code unless otherwise stated.

found true knife use and tying and binding allegations.  (§ 667.61, subds. (a), (e)(3) & (5).)  The trial court sentenced appellant to prison for 50 years.[2]

Appellant contends that the trial court committed reversible error by allowing the jurors to hear a Spanish language audio recording of his confession, along with an English transcript, although many jurors did not comprehend Spanish; by failing to instruct jurors with CALCRIM No. 121 or its equivalent, that they must accept the English translation of the interrogation as the evidence even if they would translate it differently; and by failing to instruct the jury on the allegation that appellant used a knife in the commission of the sodomy.  We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

*Prosecution Case*

In January 2011, appellant lived in an apartment with his wife, Leidy S., her two-year-old son, O.S., and their nine-month-old daughter, Valerie.  On Saturday, January 15, Leidy went to school, where she was studying to become a medical assistant. She left Valerie and O.S. with appellant.  At about 1:40 p.m., she received a text message from appellant that said, "Forgive me.  I failed you."  Leidy tried to call appellant but he did not answer.  She rushed home, and arrived at about 2:30 p.m.  Leidy's son was there, but Valerie was gone.  Leidy asked if everything was "fine."  Appellant said that Valerie was with his sister.

Leidy went into the bedroom and sat on the bed.  Appellant followed. When she tried to stand, he pushed her, threw her on the bed, and straddled her, with his legs over her stomach.  She asked, "Why are you doing this?"  Appellant answered, "Shut up, damn it."  He tied Leidy's hands above her head with curtain ties, covered her mouth with his hand, and asked why she was "in that condition."  She asked him where Valerie

---

[2]  Appellant's sentence includes 15 years to life for second degree murder (which was stayed pursuant to section 654); 25 years to life for assault on a child causing death; and 25 years to life for committing forcible sodomy, with knife use and tying and binding circumstances.

2

was.  He answered, "I killed her."  He said Valerie had been crying a lot and he hit her chest with his fist.  He next said he put gasoline on Valerie and burned her.

Appellant left the bedroom briefly and returned with a knife.  He then straddled Leidy, while holding the knife.  He told her she had a pretty face but it would look better with a mark on it.  Leidy tried to calm him down, and said that her Cesarean section scar hurt.  He moved the knife to that scar and said she would be in no more pain.  Appellant then stabbed the mattress with the knife, told Leidy to shut up, and choked her.  He untied her hands, turned her onto her stomach, and tied her hands behind her.  He penetrated her anus with his penis, and withdrew before ejaculating on her buttocks.

At some point, Leidy lost consciousness.  When she awoke, appellant was hitting her chest.  She started crying and asked him to bring Valerie to her.  He tied Leidy's feet with a scarf, and used bungee cords to attach her feet to her bound hands.  He told her to be quiet while he went to get Valerie, and threatened to take her son if she made noise.  Appellant went outside, returned shortly with Valerie, and placed her near Leidy's face.  Valerie was cold, and she was not breathing.  Leidy knew she was dead.  In her effort to break free Leidy told appellant that she could revive Valerie.  When appellant untied her, she yelled for Valerie to wake up then asked appellant if she could get her stethoscope.  Leidy then pretended to search for it but grabbed her son and fled to a nearby auto shop.  She told its occupants what had happened and that appellant was chasing her.  She hid in the auto shop restroom and stayed there until the police arrived.

South Gate Police Officer Pellerin took Leidy from the auto shop to her apartment.  He found Valerie's body lying "on the bed, face up."  Her chest and legs were covered with bruises.  He took Valerie to St. Frances Medical Center.  A forensic sexual assault specialist nurse examined Leidy at St. Francis.  Leidy's external anal region had two large tears, as well as redness, bruises, and abrasions.  Her injuries were consistent with recent penal penetration of the anus.  Leidy's neck, skin, and wrists were also red and bruised.

On January 16, 2011, South Gate Police Officer Manuel Arana met with Leidy at her mother's house.  Leidy had received several text messages and phone calls

3

from appellant.  Arana, who spoke Spanish, read the messages.  Leidy used her telephone speaker so Arana could hear her conversations with appellant.  Leidy told him Valerie was alive, but in serious condition.  She asked why he hit Valerie.  Appellant replied, "Because she had cried too much."  He also said he punched her chest, and she stopped breathing and turned purple.  Appellant asked Leidy to help him by picking up two pay checks from his employer, and getting a passport and an airline ticket.

Appellant fled to Mexico but he was captured there and returned to California.  On January 19, 2011, South Gate Police Sergeant Howard Cooper, his partner, Detective Donna Cheek, and a Spanish-speaking detective, Margarita Berron, questioned appellant.  The interview was conducted in Spanish, recorded, translated and transcribed.

Appellant admitted that he hit Valerie on the chest several times.  At Cooper's request, appellant demonstrated how hard he hit her by hitting Cooper's hand.  Using his fist, he struck Cooper's hand with "a great force" that knocked it backward, and caused a "loud slapping sound."  He said that Valerie kept crying after he hit her.  He took her to the bedroom and threw her on the bed, face down.  He hit the back of her head several times with his hand and a tennis shoe.  When Valerie stopped breathing, he tried to revive her.  He then put her body in his car and moved it around the corner.  He also admitted tying and binding Leidy.  After denying that his penis penetrated her anus, he said "I think that I did try."

Los Angeles Coroner Deputy Medical Examiner Job Augustine testified that Valerie had multiple bruised areas on her chest and lower back, as well as multiple skull fractures.  Her chest bruises were consistent with someone hitting her chest.  Multiple blunt force injuries to Valerie's head and chest caused her death.

*Defense Case*

Appellant testified that Valerie would not stop crying on January 15, 2011, when his wife, Leidy, was at school.  He struck Valerie's chest several times, and struck her head with a shoe.  After she stopped breathing, he put her body in his car, and moved

4

the car so he would not "get caught." When Leidy returned, he said that Valerie was with his sister. He admitted that he tied Leidy's hands in the bedroom, and threatened her with a knife. He did not remember that he had any sexual contact with Leidy that day, but admitted that he ejaculated on her buttocks.

DISCUSSION

*Audio Tape and Transcript*

Appellant contends that the trial court deprived him of due process and a fair trial by admitting a recording of his Spanish language interrogation, with an English translation, so that members of the jury did not all receive the same evidence. We disagree.

"A recording in English normally constitutes the evidence of what was said, and a transcript of the tape is used only as an aid in following and understanding the tape. If the tape and the transcript conflict, the tape controls. (*People v. Brown* (1990) 225 Cal.App.3d 585, 598–599.) However, when the tape is in a foreign language, the English translation controls and is the evidence of what was said. (*People v. Cabrera* (1991) 230 Cal.App.3d 300, 304.) Any other rule would be 'nonsensical' and have 'the potential for harm where the jury includes bilingual jurors.' (*U.S. v. Fuentes – Montijo* (9th Cir. 1995) 68 F.3d 352, 355–356; accord, *People v. Cabrera, supra*, 230 Cal.App.3d at pp. 303-304.)" (*People v. Arancibia* (2013) 213 Cal.App.4th 1465, 1471 (*Arancibia*).)

Appellant's supplemental brief cites *Arancibia*, an inapposite case in which jurors heard a taped interrogation of the defendant, in Spanish, and received a transcript of the English translation. The trial court "essentially invit[ed] Spanish-speaking jurors to translate the recording [of defendant's Spanish interrogation] for themselves and the non-Spanish-speaking jurors." (*Arancibia, supra,* 213 Cal.App.4th at p. 1470.) Just before jurors received the transcript and heard the tape, the trial court instructed them as follows: "The evidence in this case is the CD [i.e. the audio recording]. The transcript is offered to you as an aid to help you understand what's on the CD. However, I can't vouch for whoever transcribed that particular CD, and so it's not the actual evidence. The actual evidence is the tape itself." (*Ibid.*) The reviewing court concluded that the trial "court's

5

error undermine[d] one of the fundamental tenets of our justice system—that a defendant's conviction may be based only on the evidence presented at trial," and reversed the defendant's convictions. (*Id.* at p. 1471.)

In contrast, before the jury heard the recording of appellant's Spanish language interrogation and received a transcript of the English translation,[3] the trial court instructed the jury as follows: "Ladies and gentlemen, we're going to be handing you a transcript. A transcript is a typed up version of an oral audio interview. You'll be able to listen to the audio. I would caution you, though, those of you who do speak Spanish, please do not listen to the Spanish that you hear on the audio. Follow along in the transcript which has been translated into English." In essence, the court below instructed jurors to ignore the Spanish, and follow the English translation. Contrary to *Arancibia*, there was no error that posed the risk that appellant's conviction could be based on any evidence other than that presented to all jurors at trial. (See *Arancibia, supra,* 213 Cal.App.4th at p. 1471.) We are not persuaded by appellant's claim that it would be impossible for Spanish-speaking jurors to ignore the Spanish on the recording. We presume that jurors followed the court's instruction that they should not listen to the Spanish on the recording. (*People v. Ibarra* (2007) 156 Cal.App.4th 1174, 1189-1190.)

*Instructional Errors*

*CALCRIM No. 121*

Appellant further contends that the trial court violated his rights to due process and a fair trial by failing to instruct jurors with CALCRIM No. 121 or its equivalent, that they were required to accept the English translation of his Spanish interrogation as the evidence even if they would translate it differently. We disagree.

In reviewing a claim of instructional error, we consider whether there is a reasonable likelihood that the jury misconstrued or misapplied the law. (*People v. Kelly* (1992) 1 Cal.4th 495, 525.) The independent standard of review is applicable in

_____

[3] The transcript contains individual Spanish questions and answers, which are each followed by an English translation. It also contains occasional contemporaneous English translations that the Spanish-speaking detective (Berron) made for other detectives.

6

assessing whether instructions correctly state the law. (*People v. Posey* (2004) 32 Cal.4th 193, 218.) We presume that jurors follow the court's instructions. (*People v. Ibarra, supra*, 156 Cal.App.4th 1174, 1189-1190.)

"The Judicial Council's Bench Notes to [CALCRIM No. 121 ] recommend that, if a recording in a foreign language is used, the court should give the Ninth Circuit's model criminal instruction 2.8 which states: 'You are about to [hear] [watch] a recording in the [specify the foreign language] language. A transcript of the recording has been admitted into evidence. The transcript is an official English-language translation of the recording. [¶] Although some of you may know the [specify the foreign language] language, it is important that all jurors consider the same evidence. Therefore, you must accept the English translation contained in the transcript even if you would translate it differently.' (Ninth Circuit Manual of Model Criminal Jury Instructions (2010) Criminal Cases, Jury Instruction No. 2.8; Judicial Council of Cal.Crim. Jury Instns. (2011) Bench Notes to CALCRIM No. 121, p. 22.)" (*Arancibia, supra*, 213 Cal.App.4th at p. 1470.)

The better practice would have been for the trial court to have read to the jury CALCRIM No. 121, with appropriate modifications. The court's less formal comments, however, did instruct the jury that it should ignore the Spanish it heard on the recording and follow the English transcript. We presume that it followed the court's instruction. (*People v. Ibarra, supra*, 156 Cal. App.4th at pp. 1189-1190.) Moreover, there was physical evidence of appellant's fatal assault on Valerie, corroborated by his multiple admissions to Leidy on the day of the assault, and the following day. He also testified at trial and admitted the murder and the fatal assault. Leidy gave detailed testimony describing how appellant used a knife, tied and bound her hands, choked her, and sodomized her. Her testimony was corroborated by physical evidence, and to a great extent, by appellant's testimony and admissions he made during his interrogation. In addition, he fled the country shortly after his crimes. Given the overwhelming evidence of appellant's guilt, any error in failing to instruct the jury with CALCRIM No. 121 was harmless under any standard of review. (*Chapman v. California* (1967) 386 U.S. 18, 24 [applying beyond-a- reasonable-doubt standard of review to errors of constitutional

7

magnitude]; *People v. Ross* (2007) 155 Cal.App.4th 1033, 1054-1055 [recognizing that instructional errors are reviewed under the deferential standard articulated in *People v. Watson* (1956) 46 Cal.2d 818, 836].)

### *Section 667.61, subdivision (e)(3) One Strike Knife Use Instruction*

The information alleged, and the jury found, that appellant used a knife, and tied and bound Leidy, while forcibly sodomizing her. (§ 667.61, subds. (a), (e)(3) & (5).)[4] The trial court relied upon both findings to impose a sentence of 25 years to life for forcible sodomy under the one-strike law. (§ 667.61, subd. (a).) Appellant contends that because the court failed to instruct the jury regarding the knife use circumstance, we must strike the knife use finding, and reduce his sentence for forcible sodomy to 15 years to life. (§ 667.61, subd. (b).) We disagree.

A trial court has a sua sponte duty to instruct on the circumstances specified in section 667.61, subdivision (a), which must be found to be true to invoke the "One-Strike" law. (*People v. Jones* (1997) 58 Cal.App.4th 693, 709.) We apply the *Chapman v. California, supra*, 386 U.S. 18, 24 harmless-beyond-a-reasonable-doubt standard of review to an "instructional error that improperly describes or omits an element of an offense." (*People v. Flood* (1998) 18 Cal.4th 470, 502-503.) "One situation in which instructional error removing an element of the crime from the jury's consideration has been deemed harmless is where the defendant concedes or admits that element." (*Id.* at p. 504.)

The jury had been informed of the charge and returned a verdict that included the knife use finding. While the jury should have been instructed on the specifics of the knife use, the virtually uncontroverted evidence established precisely

---

[4] In charging appellant with forcible sodomy, the information "further alleged, within the meaning of Penal Code sections 667.61 (a) and (e), as to defendant . . . DERAS that the following circumstances apply: (e)(3) use of knife / (e)(5) tying and binding."

The sodomy verdict form states the following: "We, the Jury . . . , find the defendant . . . guilty of the crime of SODOMY BY USE OF FORCE . . . . [¶] We find the allegation pursuant to Penal Code Section 667.61 (a) and (e), that the following circumstances apply: use of knife and tying and binding, to be True."

8

what it found.  Moreover, there was little nuance to be explicated by the instruction. Under these unique circumstances the court's error was plainly harmless.  (*People v. Flood, supra,* 18 Cal.4th at pp. 503, 504.)

DISPOSITION

The judgment is affirmed.

<u>NOT TO BE PUBLISHED.</u>

PERREN, J.

We concur:

GILBERT, P. J.

YEGAN, J.

Philip H. Hicock, Judge

Superior Court County of Los Angeles

_____

Richard D. Miggins, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Victoria B. Wilson, Supervising Deputy Attorney General, Erika D. Jackson, Deputy Attorney General, for Plaintiff and Respondent.