Filed 2/21/14  P. v. Martinez CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B244833 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. SA073630) |
| v. | |
| JESUS MARTINEZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Katherine Mader, Judge.  Affirmed with directions.

David M. Thompson, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Linda C. Johnson, Supervising Deputy Attorney General, and Michael Katz, Deputy Attorney General, for Plaintiff and Respondent.

————————————

Defendant appeals his conviction of 10 counts of lewd and lascivious conduct with a minor (Pen. Code, § 288, subd. (a)) and two counts of oral copulation or sexual penetration with a child 10 years or younger (Pen. Code, § 288.7, subd. (b)).[1]  He contends that (1) the trial court erred in failing to instruct the jury they were to rely on the English transcription of his two police interviews, rather than the Spanish language recording; (2) counsel was ineffective for failing to request such an instruction, and (3) the restitution fine imposed under section 294 was improper and must be stricken.  We affirm defendant's conviction, but strike the child abuse restitution fine imposed under section 294 and remand the matter for the trial court to consider the factors under section 288, subdivision (e) in imposing a restitution fine.

### FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Defendant was charged with 10 counts of lewd and lascivious conduct with a minor (§ 288, subd. (a)) and two counts of oral copulation or sexual penetration with a child 10 years or younger (§ 288.7, subd. (b)).

Seven-year-old P.P. lived with her mother Maribel in one of the bedrooms of a three-bedroom apartment; the other bedrooms were rented by others.  P.P.'s biological father had died in an automobile accident when P.P. was two years old.  Defendant lived with them, and P.P. called him "Dad."

In February 2010, one of P.P.'s friends at school, Christina, repeated things of a sexual nature she had heard from one of her friends at school.  Christina's father reported this to school officials, who learned from Christina that P.P. was the person who had told her these things.

On February 16, 2010, Officer Taaj Muhammad went to P.P.'s elementary school.  Officer Muhammad asked P.P. if she knew what her "privates" were, and P.P. answered, "yes," and pointed to her chest, vagina and buttocks.  Officer Muhammad spoke to Christina, who told Officer Muhammad that P.P. had stated that "her dad let[] her touch

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

2

his privates [penis]." Officer Muhammad asked P.P. if this was true, and P.P. replied, "yes." P.P. stated that she played a touching game with defendant where she would touch defendant's penis and defendant would put his mouth on her "privates." P.P. would hold defendant's penis and then "tears" would come out of defendant's penis. Defendant would put his mouth on her "private" and bite it. Other times, P.P.'s mother would be involved. Defendant, Maribel and P.P. would sit in a circle and cross their legs "Indian style." They would all touch each other. Most of these incidents occurred in the bedroom.

Ruby Guillen, a child abuse investigator for the Department of Children and Family Services also interviewed P.P. on February 16, 2010. P.P. told her that, "I saw my dad's private," and that "It doesn't look like my private," it "looks like a fat stick." P.P. would rub defendant's penis, which she described as "wiggly," "really fast," after which "tears" would come out. P.P. used silver and white crayons to show Guillen the color of the "tears." On more than one occasion defendant rubbed his penis on her "private." When asked where defendant's penis was located on his body, P.P. used a gingerbread man and pointed at the crotch. P.P. drew a picture of defendant's penis by drawing a circle and an oblong circle with hashmarks. When Guillen asked her what the hash marks were for, P.P. said, "hair." Sometimes, P.P. and her mother and father would be in the shower together and P.P. touched defendant, and she would laugh.

P.P. also testified at trial. She said that defendant, more than once, made her touch his penis with her mouth. About 10 times, she touched his private part and a bit of clear water would come out, which defendant would wipe with his shirt. Sometimes his pants were on, and sometimes he had taken them off. Defendant and P.P. sometimes touched Maribel's "top private part" with their hands, and acted like it was a game.

Defendant denied P.P.'s allegations. Los Angeles Police Detective Javier Sanchez interviewed defendant. Defendant told him that he and Maribel were no longer in a romantic relationship, but were friends. He had known P.P. since she was four and a half to five years old. When asked why he was being interviewed, defendant said he was told

3

he had been accused of making P.P. touch his penis and anus. Defendant denied any wrongdoing, and did not understand why P.P. would say that he had done so.

Defendant stated that P.P. had not seen him having sex with her Mother. One time, when he told Maribel he was going to the bathroom to urinate, P.P. said, "weiner." Defendant explained to her that the correct word was "penis." Defendant did not dress or bathe in front of P.P.; the only time P.P. would have seen his penis was one time when he was urinating. P.P. was in the bathroom brushing her teeth, and defendant had his back to her. P.P. came up on one side and said, "that's your penis." Defendant denied that she touched his penis. In his interview, defendant stated he told her to move away when she tried to touch his penis. Defendant admitted P.P. touched his penis. Defendant told her not to touch it. One time, defendant taught P.P. how to wipe herself after having a bowel movement. He denied putting his finger in her anus.

Defendant told police that P.P. often sucked Maribel's breasts. On several occasions, P.P. sucked one of her mother's breasts while defendant sucked the other one. Defendant asserted it was not sexual and not intended to excite P.P.

A search of defendant's computer revealed about 700 images of young girls, aged 9 to 17 years old. The girls were in different states of undress and some were shown engaging in sexual conduct. In addition, a compact disk found in defendant's possession contained approximately 30 stories involving the sexual experiences of underage girls with their father, mother, or both. Redacted summaries of the stories were read to the jury. Defendant admitted downloading the stories, but claimed he did not read again after downloading them.

Defendant's first trial resulted in a mistrial after the jury reported they were unable to reach a unanimous verdict. After a second trial, the jury found defendant guilty on all counts. The trial court sentenced defendant to a total term of 54 years to life, consisting of the midterm of six years on count 1, the principal term; 18 years on counts 2 through 10 (one-third of the midterm of two years on each count, to run consecutively), and on counts 12 and 13, 15 years to life on each count, to run consecutively. The court imposed

a restitution fine in the sum of $2,880 (§ 1202.4, subd. (b)), a parole revocation fine of $2,880 (§ 12.02.45), a court security fee of $480 (§ 1265.8), a criminal conviction assessment of $360 (Gov. Code, § 70373), a sexual habitual offender fund fine of $300 (§ 290.3, and a child abuse restitution fine of $5,000 (§ 294).

## DISCUSSION

### I.     Instructional Error

Defendant argues that the trial court erred in failing to provide any guidance to the jury concerning its use of the two recorded interviews, which were in Spanish, and the written transcripts of those interviews, which were in English.  Under the general rule, he argues, where a recording and its transcript conflict, the recording controls (*People v. Brown* (1990) 225 Cal.App.3d 585, 598–599); however, where the interview is in a foreign language, the transcript controls (See *People v. Cabrera* (1991) 230 Cal.App.3d 300, 303–304).  Conceding that *People v. Arancibia* (February 27, 2013, B240341, opn. ordered nonpub. June 12, 2013), in which the court held that it was error to instruct the jury that Spanish language recording, not the English language translation, controlled, was ordered not published by the Supreme Court, he nonetheless argues that some guidance was required because it is not unreasonable to assume some jurors spoke Spanish, and any error was not harmless beyond a reasonable doubt because it would not be unusual for a Spanish speaking juror to assign Spanish words a different meaning when spoken in Spanish than the same words set out in an English translation.  Respondent asserts that there is no sua sponte duty to instruct with a modified version of CALCRIMM No. 121 when a party introduces a translation of a foreign language recording, and there is no basis to conclude that a juror would have concluded they could use their own interpretation of the recording rather than relying on the transcripts, and thus it is not reasonably likely the verdict would have been different.

### A.     *Factual Background*

Defendant's interviews with Detective Sanchez (Feb. 17, 2010 and Feb. 19, 2010) were conducted in Spanish and recorded.  A DVD of each interview was played for the

jury. The jurors were given transcripts of the interviews containing side-by-side Spanish to English translations to permit the jury to follow along with the DVD. The trial court did not admonish the jury concerning the use of the recordings or transcripts. At least two and possibly three jurors were Hispanic, but the record does not indicate if any of these jurors spoke or understood Spanish. The jury consisted of two female Caucasians, three male Caucasians, three male African-Americans, a female African-American, two male Hispanics, and one male Asian. The alternates were a male Caucasian, and female Caucasian, and a female African-American. The record does not reflect whether any of these jurors spoke Spanish.

At trial, there was some evidence that the recording was not redacted properly because it contained references to "dildoes," "dresses" and other clothes, while the transcription of page four of the first interview transcript indicates this material was redacted. In addition, on page 88 of the second interview transcript Detective Sanchez states, "I've also seen a lot that the daughters pin it on their fathers," while the Detective at trial stated the sentence had been "lost in translation."

### B.    Discussion

An audio recording normally constitutes the evidence of what was said, and a transcript of the tape is used only as an aid in following and understanding the tape. If the tape and the transcript conflict, the tape controls. (*People v. Houston* (2012) 54 Cal.4th 1186, 1214; see also *People v. Brown*, *supra*, 225 Cal.App.3d at pp. 598–599.) Where the tape is in a foreign language and the transcript is in English, the transcript controls. (See *People. v. Cabrera*, *supra*, 230 Cal.App.3d at p. 304; *U.S. v. Fuentes-Montijo* (9th Cir. 1955) 68 F.3d 352, 355–356.) In *Cabrera*, defendant was charged with committing lewd acts upon a child. During deliberations, some Spanish speaking jurors expressed disagreement with the English language translation of defendant's Spanish language testimony. Specifically, one juror told the other jurors that the defendant testified he "pushed" the child, but the interpreter translated the word as "touched" in order to get her to do her household chores. (*Cabrera*, at p. 302.) *Cabrera* found it was juror misconduct

6

for the juror to translate the word for the other jury members, but that the error was harmless because no reasonable jury would have drawn the conclusion that if defendant pushed the child, he also sexually abused her. (*Id.* at p. 305.) "When, as here, a district court is faced with a jury that includes one or more bilingual jurors and the taped conversations are in a language other than English, restrictions on the jurors who are conversant with the foreign tongue is not only appropriate, it may in fact be essential. Where the translation of a portion of the tape is disputed, both sides have an interest in what information is given to the jury. The rules of evidence and the expert testimony would prove of little use if a self-styled expert in the deliberations were free to give his or her opinion on this crucial issue, unknown to the parties." (*U.S. v. Fuentes-Montijo*, at p. 355.)

CALCRIM No. 121 provides: "Some testimony may be given in [insert name or description of language other than English]. An interpreter will provide a translation for you at the time that the testimony is given. You must rely on the translation provided by the interpreter, even if you understand the language spoken by the witness. Do not retranslate any testimony for other jurors. If you believe the court interpreter translated testimony incorrectly, let me know immediately by writing a note and giving it to the (clerk/bailiff)." The bench notes to CALCRIM No. 121 note that no case has held there is a sua sponte duty to give the instruction, but provide that a modified version of the instruction in accord with the Ninth Circuit Manual of Model Jury Instructions, Criminal Cases, Instruction No. 2.8, should be given where a recording in a foreign language is used.[2] The standard used to judge any error is that articulated in *People v. Watson* (1956)

---

[2] Instruction 2.8 states: "You are about to [hear] [watch] a recording in the [specify the foreign language] language. A transcript of the recording has been admitted into evidence. The transcript is an official English-language translation of the recording. [¶] Although some of you may know the [specify the foreign language] language, it is important that all jurors consider the same evidence. Therefore, you must accept the English translation contained in the transcript even if you would translate it differently." (Ninth Circuit Manual of Model Criminal Jury Instructions (2010) Criminal Cases, Jury Instruction No. 2.8.)

7

46 Cal.2d 818, 834, citing article VI, section 13 of the California Constitution: "'No judgment shall be set aside, or new trial granted, in any case, on the ground of misdirection of the jury, or of the improper admission or rejection of evidence, or for any error as to any matter of pleading, or for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice'" (Italics omitted.)

Here, while we agree it is a better practice to give an appropriate instruction when a foreign language tape is transcribed into a written English transcription, defendant's arguments of error here are based upon speculation: Defendant speculates that at least two of the jurors spoke or understood Spanish; that because there were two obvious errors in the translation (specifically, the inclusion of redacted material in the audio and Detective Sanchez's statement "he had seen a lot of daughters pin it on their fathers" may have been lost in translation) there must be many more errors; and that any such errors add up to a reasonable likelihood the result would have likely been different because the jurors relied on facts not in evidence to convict defendant. Even assuming there was some discrepancy between the recording of defendant's interviews and the English transcription, defendant provides no cogent analysis of why those discrepancies would have resulted in a different verdict. Although defendant denied all but the incident in the bathroom where P.P. observed him urinating, P.P. gave compelling, detailed and consistent testimony about defendant's conduct not only at trial but to the persons who interviewed her. As a result, it is not reasonably probable a different result would have occurred at trial if the jury had been instructed with CALCRIM No. 121, or in any other way, on the proper roles of the recording versus the transcript.

## II. Ineffective Assistance of Counsel

Defendant argues that counsel was ineffective for failing to request an appropriate instruction from the court regarding the jury's proper consideration of the transcriptions and recorded interviews. Conceding that *Arancibia* does not apply and thus any error is

not structural, he argues the error is "not subject to any standard of review," but at a minimum was prejudicial under the harmless beyond a reasonable doubt standard of error. Respondent asserts that there is no authority requiring any sua sponte instruction on the evidentiary supremacy of the English transcript over the Spanish language recording, and counsel was not ineffective for not asking for such an instruction.

The right to effective assistance of counsel derives from the Sixth Amendment right to assistance of counsel. (*Strickland v. Washington* (1984) 466 U.S. 668, 686–694 [104 S.Ct. 2052, 80 L.Ed.2d 674]; see also Cal. Const., art. I, § 15.) To demonstrate ineffective assistance, defendant must show (1) "counsel's conduct was deficient when measured against the standard of a reasonably competent attorney," and (2) prejudice resulting from counsel's performance "'so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.'" (*People v. Mayfield* (1997) 14 Cal.4th 668, 784.) Prejudice is shown where there is a reasonable probability, but for counsel's errors, that the result of the proceeding would have been different. (*In re Harris* (1993) 5 Cal.4th 813, 833.) Our review of counsel's performance is deferential, and strategic choices made after a thorough investigation of the law and facts are "virtually unchallengeable." (*In re Cudjo* (1999) 20 Cal.4th 673, 692.)

Here, we need not debate with defendant the standard of review to apply to counsel's conduct in this case. As a threshold issue, even if we were to find that counsel's performance was deficient—an issue we need not decide, because as discussed above, defendant cannot show prejudice because it is not reasonably probable a different result would have occurred at trial if the jury had been instructed on the proper roles of the recording versus the transcript with CALCRIM No. 121 or a similar instruction.

## III.    Restitution Fine

Defendant argues the trial court erred in imposing a child abuse restitution fine of $5,000 under section 294, which does not apply to a conviction under section 288, subdivision (a), and requests we strike the fine. Respondent concedes that section 294

does not apply but argues that the trial court had the authority to order a fine under section 288, subdivision (e), the trial court intended to impose a fine but inadvertently cited the wrong statute, and requests that we amend the abstract of judgment. Defendant responds that section 294 imposes a "restitution fine," while section 288, subdivision (e) imposes a "fine," making the statutes qualitatively different: Sums collected under section 294 are deposited in the restitution fund to be transferred to the county children's trust for the purpose of child abuse prevention, while sums collected under section 288, subdivision (e) go to the Victim-Witness Assistance Fund to fund counseling centers and prevention programs; further section 294 is imposed solely based on the defendant's ability to pay, while section 288, subdivision (e) additionally requires consideration of the gravity of the offense, the circumstances of its commission, whether the defendant derived any economic gain, and the extent to which the victim suffered economic losses. Thus, he contends, this court cannot simply correct its clerical error, and must remand the matter to the trial court to consider the relevant factors.

Section 294, by its terms, does not apply to convictions under section 288. Section 288, subdivision (e) provides, "[u]pon the conviction of any person for a violation of subdivision (a) or (b), the court may, in addition to any other penalty or fine imposed, order the defendant to pay an additional fine not to exceed ten thousand dollars ($10,000). In setting the amount of the fine, the court shall consider any relevant factors, including, but not limited to, the seriousness and gravity of the offense, the circumstances of its commission, whether the defendant derived any economic gain as a result of the crime, and the extent to which the victim suffered economic losses as a result of the crime. Every fine imposed and collected under this section shall be deposited in the Victim-Witness Assistance Fund to be available for appropriation to fund child sexual exploitation and child sexual abuse victim counseling centers and prevention programs pursuant to Section 13837." We agree with defendant's argument and strike the restitution fine imposed under section 294, and remand the matter for the court to calculate the amount of any fine under section 288, subdivision (e).

10

## DISPOSITION

The restitution fine imposed under Penal Code section 294 is stricken, and the matter is remanded for the trial court to consider the relevant factors of Penal Code section 288, subdivision (e) in imposing a fine on defendant. After doing so, the superior court is to forward copy of the corrected abstract of judgment to the Department of Rehabilitation and Corrections. In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED.

JOHNSON, J.

We concur:

CHANEY, Acting P. J.

MILLER, J.*

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice Pursuant to article VI, section 6 of the California Constitution.