Filed 6/28/19

CERTIFIED FOR PARTIAL PUBLICATION*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE,<br><br>　　　　Plaintiff and Respondent,<br><br>v.<br><br>CARL JONES,<br><br>　　　　Defendant and Appellant. | E069873<br><br>(Super.Ct.No. FSB17003100)<br><br>OPINION |

APPEAL from the Superior Court of San Bernardino County.  Gregory S. Tavill, Judge.  Affirmed with directions.

Marilee Marshall, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, and Melissa Mandel, Meredith S. White, Genevieve Herbert and Craig H. Russell, Deputy Attorneys General, for Plaintiff and Respondent.

---

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts I and II.A.

1

Defendant and appellant Carl Jones was convicted of sodomy of an unconscious victim pursuant to Penal Code section 286, subdivision (f), a felony. The trial exhibits included a video recording where Jones's roommate recounted what she had observed to an investigator. What the roommate said was hard to discern at times, and the parties disputed whether she said she heard the victim tell Jones immediately before the incident that "'I'm a little horny.'" Whether the victim made such a remark would bear on whether she was conscious and gave consent. On appeal, Jones contends that the trial court erred by not providing the jury a version of the video's transcript that contains the line "'I'm a little horny.'" The trial court correctly informed the jury, however, that the video itself was the evidence, not any transcript purporting to indicate the contents of the video. Therefore, in the unpublished portion of this opinion, we reject Jones's contention and affirm the conviction.

In a supplemental brief relying on *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*), Jones contends that the trial court's imposition of a $70 fee for "court construction and court operations" as well as a $300 restitution fine violated his right to due process absent a determination of his ability to pay. We hold that Jones has not forfeited this argument despite his failure to raise it in the trial court but affirm the imposition of the fine and fees on the record before us.

## I. FACTS

### A. *The Incident*

N.G., the victim, first met Jones in 2016 when they were both "into" drugs and prostitution. Although N.G. orally copulated Jones on one occasion several months

before the incident took place, N.G. considered Jones as a friend, and the two had no other sexual intercourse or relationship.

Around July 2017, N.G. was homeless, and Jones offered to let N.G. stay at his apartment. N.G., who had been awake for several days on cocaine, accepted. N.G. slept in Jones's bed with the understanding that they would not be sleeping "at the same time, ever." Jones had a roommate, Angela Gatlin, who slept on a couch in the living room.

By August 4, 2017, N.G. had been in and out of sleep for several days. At one point, she woke up with Jones's erect penis in her anus. N.G. pulled Jones's penis out of her anus and exclaimed "[w]hat are you doing?" to which Jones replied, "I'm sorry. I thought I was in your vagina." N.G. ran into the bathroom screaming. N.G. had not given Jones permission to put his penis in her anus or vagina.

Initially, N.G. did not report the incident but rather continued to stay at Jones's and Gatlin's apartment. N.G. testified that she "had nowhere to go" and that she "thought it was [her] fault that [she] was in the situation." On August 11, however, N.G. decided to report the incident.

B. *The Investigation*

Officers Mauricio Becerril and Sergio Alvarez and Supervisor Sergeant Cardillo responded to N.G.'s call on August 11. Becerril interviewed N.G. and Gatlin, while Alvarez and Cardillo interviewed Jones. N.G. became emotional and started crying during the interview. Becerril accompanied N.G. to the hospital where she was examined by a Sexual Assault Response Team (SART) nurse. N.G. affirmed to the nurse that Jones penetrated her anus with his penis.

3

Alvarez's body camera recorded his and Cardillo's interview with Jones. During the interview, Jones stated that he was trying to "get some" and that N.G. was asleep:

"[Jones]: I was trying, trying—I thought I was in the right hole. I was trying to . . . what's the word—trying to start something, I don't know the word for it, but yeah, I was trying to get some, but I was half asleep . . . .

"[Alvarez]: Uh-hum . . . .

"[Jones]: And she was asleep, I didn't know I was in the wrong hole. And I apologized and apologized. This is ridiculous. [¶] . . . [¶]

"[Alvarez]: So, you were trying to put your penis in her vagina?

"[Jones]: Right.

"[Alvarez]: Okay. But she was knocked, she was knocked out, she was asleep?

"[Jones]: We were both, we were both just sleep . . . ."

Later, Jones stated:

"[Alvarez]: So, why would you try to have sex with her this one time? Just cause you were in the mood?

"[Jones]: She was in my bed and I haven't had a woman in a long time.

"[Alvarez]: Alright. So, you were just trying to have sex with her? Did you tell her you were trying to have sex with her?

"[Jones]: She was, she sleep deep.

"[Alvarez]: Alright."

Jones also stated that he and N.C. never had a sexual relationship in the past.

4

What Gatlin purportedly said or did not say during her interview with Becerril on August 11 was heavily contested at trial and will be discussed separately below.

C. *The Trial*

At trial, Becerril testified that he interviewed Gatlin on August 11 but that "it was very hard to understand what she was saying." Gatlin testified that she could not remember what she had told Becerril because she was drunk and "under the influence" at the time. Gatlin was shown footage of her interview with Becerril, but even after watching it, Gatlin could not discern what she had said. In particular, Gatlin could not tell what she said after saying the phrase "'Oh my God.'" Becerril also could not tell what Gatlin said after "'Oh my God.'"

Initially, the trial court instructed the parties to prepare a transcript of Gatlin's interview and to note that certain portions were disputed. The next day, however, the trial court stated that it would make a ruling as to the transcript's contents if it could figure out what was said during the disputed portions. After listening to the recording in chambers "at high volume," the trial court prepared the following transcript of the pertinent portion of Gatlin's interview, showed it to the jury, and marked it as Exhibit 4A:

"Officer: You didn't hear any yelling and screaming from that room on Friday, last Friday?

"Gatlin: [Unintelligible.] . . . Well I was on the phone, I was on the phone with my, my medical IEHP and I heard her go, 'Oh my God.' . . . [Unintelligible.]

"Officer: You heard her, like if they was having sex?

5

"Gatlin: No, like she was like, 'What did you do?' He's like, 'I didn't know I did that.' She's like, 'Yes, you did . . . [Unintelligible.] You sodomized me. You sodomized me." [Unintelligible.] . . . .

"Officer: That was last Friday. Around what time?"

The trial court noted to counsel that "[t]he transcript the jury is going to see is the one I wrote." The trial court informed the jury: "The recording is the evidence, not the transcript. The transcript is simply to aid, help the jury listen to the recording. [¶] Some of the language from what was on the recording is in dispute. Some of it is unintelligible; okay. You'll decide what's on the recording, so just understand the transcript is not the evidence. The recording, that is the evidence."

During closing argument, Jones played a portion of Gatlin's interview again. When Jones argued that Gatlin said that she heard N.G. say "'My God, I'm a little horny,'" implying that N.G. may have been awake and given Jones consent, the People objected. The trial court initially sustained the objection but, once the video was replayed again before the jury, reversed and overruled the objection. Later, outside the presence of the jury, the trial court stated: "I heard it this time. I didn't hear it during the trial." The trial court stated that it could "clearly hear [the words] during the argument" but that "the discrepancy is, obviously, who's saying I'm a little horny? Is it Mr. Jones or [N.G.]? In that context we don't really know."

Jones requested that Exhibit 4A be edited to indicate that Gatlin stated that N.G. said "'I'm a little horny.'" Another version of the transcript, marked as Exhibit 4B, was prepared; Exhibits 4A and 4B are substantially identical except that, in Exhibit 4B, the

6

end of Gatlin's first statement contains the line "'I'm a little horny,'" italicized here for reference:

"Officer:  You didn't hear any yelling and screaming from that room on Friday, last Friday?

"Gatlin:  [Unintelligible.]  . . .  Well I was on the phone, I was on the phone with my, my medical IEHP and I heard her go, 'Oh my God.'  . . .  [Unintelligible.]  *'I'm a little horny.'*

"Officer:  You heard her, like if they was having sex?

"Gatlin:  No, like she was like, 'What did you do?'  He's like, 'I didn't know I did that.'  She's like, 'Yes, you did.  You know . . .  [Unintelligible.]  You sodomized me.  You sodomized me."  [Unintelligible.] . . . .

"Officer:  That was last Friday.  Around what time?"

Although the trial court previously had ruled that Exhibit 4A would go to the jury room, it ultimately decided that the jury would not receive either Exhibit 4A or 4B. Exhibit 4B was not shown to the jury.  The trial court stated that the jury would "have the recording without the transcripts."

The jury found Jones guilty.  The trial court sentenced Jones to a term of six years with a credit of 332 days for presentence custody and conduct.  The trial court also imposed a $70 fee for "court construction and court operations" as well as a $300 restitution fine (Pen. Code, § 1202.4).

## II. DISCUSSION

### A. *The Conviction*

Jones contends that the trial court's refusal to provide the jury with Exhibit 4B, the transcript containing the line "'I'm a little horny,'" was reversible error. We disagree and find no error.

We review the trial court's decision on whether or not to allow the use of a transcript for abuse of discretion. (*People v. Brown* (1990) 225 Cal.App.3d 585, 599.) When provided, transcripts of recordings may be prejudicial "if it is shown they are so inaccurate that the jury might be misled into convicting an innocent man." (*Ibid.*)

The trial court acted well within its discretion in excluding Exhibit 4B. Cases have repeatedly affirmed that—apart from a deposition offered in lieu of witness testimony—where a transcript is provided with a tape or video recording to the jury, only the recording itself is evidence, not the transcript. (*People v. Jones* (2017) 3 Cal.5th 583, 611; *People v. Polk* (1996) 47 Cal.App.4th 944, 952; *People v. Brown*, *supra*, 225 Cal.App.3d at p. 599; see also Judicial Council of Cal. Civil Jury Instructions (CACI) No. 5018 ["A [sound/video] recording has been admitted into evidence, and a transcription of the recording has been provided to you. The recording itself, not the transcription, is the evidence."].) The fact that the trial court did not allow Exhibit 4B into the jury room therefore did not deprive the jury of any potentially exculpatory evidence, as the transcript was not evidence.

Jones contends that by not allowing Exhibit 4B to go to the jury, he was deprived of his only defense to the charge against him. The recording certainly was important to

8

Jones's defense. Jones did not dispute that he penetrated N.G.'s anus with his penis, so trial largely focused on whether N.G. was unconscious or gave consent at the time. Nothing prevented the jury, however, from concluding that Gatlin *did* tell Becerril that she heard N.G. say "I'm a little horny." The recording itself was admitted into evidence, and the jury had the ability to review it. Jones in fact urged the jury to consider and decide for itself whether Gatlin made the statement. As he stated during closing argument: "You may decide what she said and you should listen to that tape, and you should listen to it many, many times. Because if she said 'My God, I'm a little horny' she was awake before any penetration happened. That is important. That is maybe the most important fact in this case." Therefore, even without a transcript containing the line "I'm a little horny," the jury remained fully able to decide whether Gatlin made such a statement, and Jones was therefore not deprived of any defense.

Jones contends that not allowing Exhibit 4B into the jury room was error because the trial court had earlier stated that, in Jones's words, "those portions which were not transcribed in Exhibit [4A], were not intelligible." Implicitly, Jones is arguing that the trial court's characterization in Exhibit 4A of certain statements as unintelligible was conclusive. But, as mentioned, the trial court admonished the jury that the transcript was only an aid to help it listen to the recording, that only the recording itself was evidence, and that it was up to the jury to decide what was said on the recording. The admonition cuts against any suggestion that the trial court's characterization of statements as unintelligible was authoritative. Jones's contention therefore lacks merit.

9

Jones also contends that the trial court erred by showing the jury "a transcript that the court knew to be inaccurate." The recording itself is not part of the record on appeal, so we cannot review it independently. Even assuming, however, that Gatlin did in fact tell Becerril that N.G. said "I'm a little horny"—and that Exhibit 4A was in this sense inaccurate—we are not convinced that what the jury saw was "so inaccurate" that it "might be misled into convicting an innocent man." (*People v. Brown*, *supra*, 225 Cal.App.3d at p. 599.) Whatever Gatlin might have said immediately after "Oh my God," it is abundantly clear that what she said was hard to discern. The trial court eventually concluded that Gatlin said, "I'm a little horny" but only after hearing the recording during closing argument; when listening to the recording "at high volume" and preparing Exhibit 4A, the trial court did not believe Gatlin made the statement. Tellingly, neither Becerril nor even Gatlin herself could identify what she said after "Oh my God." Moreover, even after the trial court concluded that Gatlin said, "I'm a little horny," it noted that it was still unclear whether that statement was attributable to N.G. or Jones. Given these circumstances, even assuming for the sake of argument that Gatlin did say "I'm a little horny," the transcript was not so inaccurate as to create prejudicial error.[1] Whether she made that statement was an issue for the jury, and the parties were able to litigate that issue fairly here.

---

[1] Because we find no error, we do not reach Jones's argument, premised on an error, that the conviction violated his due process rights or right to a jury trial.

B.  Dueñas *Error*

While this case was pending, another district of this Court of Appeal decided *Dueñas*, which held that a trial court must "conduct an ability to pay hearing and ascertain a defendant's present ability to pay" before requiring a defendant to pay assessments under Government Code section 70373 and Penal Code section 1465.8 or a restitution fine under Penal Code section 1202.4.  (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1164.)  In a supplemental brief, Jones contends that the trial court's imposition of $70 in fees and a $300 restitution fine without first holding an ability to pay hearing violated his due process rights, which we will call *Dueñas* error.[2]  The People do not contend that *Dueñas* was wrongly decided.  Rather, the People first contend that Jones forfeited the claim by failing to raise it below.  The People then contend that any *Dueñas* error was harmless because the record does not establish an inability to pay or any negative consequences that would arise from a failure to pay.

As we explain, although Jones did not object to the fine and fees below, he may raise it for the first time on appeal because an objection prior to *Dueñas* "'would have been futile or wholly unsupported by substantive law then in existence.'"  (*People v. Brooks* (2017) 3 Cal.5th 1, 92.)  It is not Jones's burden to establish an inability to pay in

---

[2]  The record does not specify the statute or statutes invoked in assessing the $70, but it is apparently a combination of a $30 court facilities assessment (Gov. Code, § 70373, subd. (a)(1)) and a $40 court operations assessment (Pen. Code, § 1465.8, subd. (a)(1)), both of which "shall be imposed on every conviction for a criminal offense" subject to exceptions not applicable here.  Because these amounts are not reflected in the abstract of judgment, we order that the abstract of judgment be corrected to reflect these amounts.  (*People v. Mitchell* (2001) 26 Cal.4th 181, 188.)

11

this appeal, because the issue was not litigated in trial court.  Nevertheless, because Jones will be able to earn the total amount imposed during his sentence of imprisonment, the *Dueñas* error was harmless.

### 1. *Forfeiture*

"Reviewing courts have traditionally excused parties for failing to raise an issue at trial where an objection would have been futile or wholly unsupported by substantive law then in existence."  (*People v. Welch* (1993) 5 Cal.4th 228, 237.)  Forfeiture in this context has also been conceptualized as asking whether "'the pertinent law later changed so unforeseeably that it is unreasonable to expect trial counsel to have anticipated the change.'"  (*People v. Black* (2007) 41 Cal.4th 799, 810 (*Black*).)  In determining whether the objection would have been futile, "we consider the 'state of the law as it would have appeared to competent and knowledgeable counsel at the time of the trial.'"  (*Id.* at p. 811; see also *People v. De Santiago* (1969) 71 Cal.2d 18, 23 [inquiry is guided "by practical considerations as to what competent and knowledgeable members of the legal profession should reasonably have concluded the law to be"].)

At the time of Jones's trial and sentencing, controlling case law on point effectively foreclosed any objection that imposing the $300 restitution fine without conducting an ability to pay hearing violated his due process rights.  In *People v. Long* (1985) 164 Cal.App.3d 820 (*Long*), the Court of Appeal rejected the defendant's argument that the "failure to consider his ability to pay the restitution fine deprived him of due process of law," concluding that "there [was] no constitutional infirmity in the imposition by the trial court of a . . . restitution fine on defendant."  (*Id.* at pp. 826, 828.)

12

At bottom, *Dueñas* simply disagreed with *Long*'s due process analysis.  (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1172, fn. 10.)  While *Dueñas* noted that *Long* interpreted statutes that were subsequently amended (*Duenas*, *supra*, at p. 1172, fn. 10), we do not see the fact of amendments as having been decisive in *Dueñas*, nor changes that foretold that decision.  The amendments did not change the relevant bases for the fines.  For instance, *Long* noted that the restitution fine, then imposed under Government Code section 13967, "is not restitution made directly to the victim of the offense but is a fine imposed by law." (*Long*, *supra*, 164 Cal.App.3d at p. 826.)  The same is to be said for the restitution fine imposed on Jones pursuant to Penal Code section 1202.4, subdivision (b); it is distinct from direct victim restitution and is instead paid into the state's Restitution Fund.  (Pen. Code, § 1202.4, subd. (e).)  As well, *Long* emphasized that the defendant cannot be incarcerated solely based on an inability to pay the restitution fine, that any unpaid amounts would be deemed a debt owing to the state, and that the fine is reduced by any amounts actually paid to the victim.  (*Long*, *supra*, at pp. 827-828.)  All of these features remain under current law.  (Pen. Code, § 1205, subds. (a), (f) [although a "judgment that the defendant pay a fine . . . may also direct that he or she be imprisoned until the fine is satisfied," the section "shall not apply to restitution fines and restitution orders"]; § 1202.43, subd. (b) ["A restitution fine shall be deemed a debt of the defendant owing to the state . . . excepting any amounts the defendant has paid to the victim as a result of the crime."].)  *Long* was therefore controlling at the time of Jones's sentencing.

Aside from *Long*, the Penal Code itself all but precluded Jones from meaningfully contesting the restitution fine.  Penal Code section 1202.4, subdivision (b)(1) states that

13

"[i]f the person is convicted of a felony, the fine shall not be less than three hundred dollars ($300)," which was the amount imposed here. Subdivision (c) of that section, moreover, states that "[i]nability to pay may be considered *only* in increasing the amount of the restitution fine *in excess of the minimum fine* pursuant to paragraph (1) of subdivision (b)." (Italics added.) Because only the minimum amount was imposed, the statute strongly supported the conclusion that the trial court had no discretion to take ability to pay into account.

Similarly, the relevant statutes all but foreclosed any due process objections to the court facilities or court operations assessments. As *Dueñas* noted, neither Government Code section 70373 nor Penal Code section 1465.8 expressly requires that the pertinent assessment be premised on an ability to pay. (See *Dueñas*, *supra*, 30 Cal.App.5th at p. 1166 [both sections are "silent as to the consideration of a defendant's ability to pay in imposing the assessments"].) Without language in those sections instructing courts to condition the assessments on an ability to pay, Jones's failure to object is excusable. (See *People v. Ellis* (2019) 31 Cal.App.5th 1090, 1094 ["[T]here is no language in the statute that provides the restriction that [appellant] asks us to impose. Moreover, it is not the province of this court to insert words or add provisions to an unambiguous statute."].)

Because a due process objection would have been "futile or wholly unsupported by substantive law then in existence" had it been raised to the trial court, Jones has not forfeited the argument by failing to raise it below. (*People v. Brooks*, *supra*, 3 Cal.5th at p. 92.) "The circumstance that some attorneys may have had the foresight to raise this issue [in *Dueñas*] does not mean that competent and knowledgeable counsel reasonably

14

could have been expected to have anticipated" *Dueñas*. (*Black*, *supra*, 41 Cal.4th at p. 812.) Given the substantive law in existence at the time of Jones's sentencing, *Dueñas* was unforeseeable. We therefore agree with and follow other courts that have similarly declined to find forfeiture on an alleged *Dueñas* error. (*People v. Castellano* (2019) 33 Cal.App.5th 485, 489; *People v. Johnson* (May 10, 2019) __ Cal.App.5th __ [2019 Cal. App. LEXIS 426 at *4].)

In *People v. Frandsen* (2019) 33 Cal.App.5th 1126 (*Frandsen*), another district of this Court reached a contrary result, holding that a failure to object to the same assessments constituted forfeiture. (*Id.* at pp. 1153-1155.) Part of *Frandsen*'s reasoning rested on the fact that the restitution fine there was $10,000, the *maximum* amount that may be imposed under Penal Code section 1202.4, subdivision (b). (*Frandsen*, *supra*, at p. 1153.) Because, as noted, even before *Dueñas*, the Penal Code indicated that inability to pay may be considered in increasing the amount of the restitution fine above the $300 minimum, *Frandsen* was correct to conclude that "[s]uch an objection would not have been futile under governing law at the time of his sentencing hearing." (*Frandsen*, *supra*, at p. 1154.)

With regard to the court facilities and court operations assessments, however, *Frandsen* stated that nothing prevented the defendant from "making the same request that the defendant in *Dueñas* made . . . ." (*Frandsen*, *supra*, 33 Cal.App.5th at p. 1154.) *Frandsen* disagreed that *Dueñas* was unforeseeable, stating: "*Dueñas* was foreseeable. Dueñas herself foresaw it. The *Dueñas* opinion applied 'the *Griffin-Antazo-Bearden* analysis,' which flowed from *Griffin v. Illinois* (1956) 351 U.S. 12 [100 L.Ed. 891, 76

15

S.Ct. 585], *In re Antazo* (1970) 3 Cal.3d 100 [89 Cal. Rptr. 255, 473 P.2d 999], and *Bearden v. Georgia* (1983) 461 U.S. 660 [76 L.Ed.2d 221, 103 S.Ct. 2064]. (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1168.) The *Dueñas* opinion likewise observed '"[t]he principle that a punitive award must be considered in light of the defendant's financial condition is ancient." (*Adams v. Murakami* (1991) 54 Cal.3d 105, 113 [284 Cal. Rptr. 318, 813 P.2d 1348].) The Magna Carta prohibited civil sanctions that were disproportionate to the offense or that would deprive the wrongdoer of his means of livelihood. [Citation.]' (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1170.)" (*Frandsen*, *supra*, 33 Cal.App.5th at pp. 1154-1155; see *id.* at p. 1155 ["*Dueñas* applied law that was old, not new"].) In our view, this was incorrect.

As discussed above, due to controlling authority in *Long*, it was reasonable for Jones to conclude at the time of his sentencing that he could not meaningfully raise the objection that ultimately prevailed in *Dueñas*. As our Supreme Court has explained, "[t]he circumstance that some attorneys may have had the foresight to raise this issue does not mean that competent and knowledgeable counsel reasonably could have been expected to anticipate[]" the change in law. (*Black*, *supra*, 41 Cal.4th at p. 812.)

Moreover, the fact that a new case relies on long-held principles or other established law does not necessarily mean it was foreseeable. *Black* demonstrates this. There, our Supreme Court considered whether a defendant forfeited a claim that he was entitled to a jury trial on sentencing issues based on an argument that the United States Supreme Court would eventually accept in *Blakely v. Washington* (2004) 542 U.S. 296 (*Blakely*). (*Black*, *supra*, 41 Cal.4th at pp. 810-812.) *Black* observed that "'the *Blakely*

16

court worked a sea change in the body of sentencing law'" and held that "a claim of sentencing error premised upon the principles established in *Blakely* and *Cunningham* [*v. California* (2007) 549 U.S. 270] is not forfeited on appeal by counsel's failure to object at trial." (*Black*, *supra*, at p. 812.)  In doing so, our Supreme Court was evidently unmoved by the fact that *Blakely* relied on cases that had been decided by the time the defendant was sentenced as well as diaries and letters from the Founding Fathers.  (See *Blakely*, *supra*, at pp. 301-305 [applying *Apprendi v. New Jersey* (2000) 530 U.S. 466]; see *Blakely*, *supra*, at pp. 305-306 [citing a diary entry from John Adams and a letter from Thomas Jefferson].)  The fact that *Blakely* relied, in its own words, on "longstanding precedent" (*id.* at p. 305) played no part in *Black*'s analysis; *Blakely* was still seen as an unforeseeable change in law.  (*Black*, *supra*, at pp. 810-812.)  Given that our Supreme Court did not find *Blakely* foreseeable in *Black*, we will not characterize *Dueñas* as foreseeable simply because it cited principles stretching back to the Magna Carta.

At the time Jones was sentenced, *Long* and the relevant statutes would have meaningfully foreclosed the argument he now seeks to advance.  Jones could not have been expected to anticipate *Dueñas*, even though *Dueñas* applied principles first articulated in other contexts long ago.  Accordingly, he has not forfeited his claim.

### 2. *Harmless Error*

The People do not dispute that the trial court imposed the fees and restitution fine without conducting an ability to pay hearing.  The People thus concede that *Dueñas* error occurred.  Nevertheless, the People contend that any such error was harmless.

17

A "'very limited class'" of federal constitutional errors are "subject to per se reversal"; all others are "amenable to harmless error analysis." (*People v. Aranda* (2012) 55 Cal.4th 342, 363; see also *Rose v. Clark* (1986) 478 U.S. 570, 578 [errors requiring automatic reversal "are the exception and not the rule"].) *Dueñas* did not address whether *Dueñas* error requires an automatic reversal. Jones does not contend that *Dueñas* error requires automatic reversal. We therefore consider whether the error here was harmless beyond a reasonable doubt. (See *Chapman v. California* (1967) 386 U.S. 18, 24 [to find constitutional error harmless, "the court must be able to declare a belief that it was harmless beyond a reasonable doubt"].)

Because no ability to pay hearing was held, it is not defendant's burden on appeal to establish his eligibility for relief. Nevertheless, we will find *Dueñas* error harmless if the record demonstrated he cannot make such a showing. Here, he cannot do so. Jones was sentenced to a term of six years with a credit of 332 days for presentence custody and conduct. Wages in California prisons currently range from $12 to $56 a month. (Cal. Code Regs., tit. 15, § 3041.2, subd. (a)(1); Cal. Dept. of Corrections and Rehabilitation, Operations Manual, ch. 5, art. 12, § 51120.6, pp. 354-355 (Jan. 1, 2019) <https://www.cdcr.ca.gov/ccjbh/wp-content/uploads/sites/172/2019/06/Ch_5_2019_DOM.pdf> [as of June 26, 2019].) And half of any wages earned (along with half of any deposits made into his trust account) are deducted to pay any outstanding restitution fine. (Pen. Code, § 2085.5, subd. (a); Cal. Code Regs., tit. 15, § 3097, subd. (f).) Given that the restitution fine is $300 and the assessments are $70, Jones will have sufficient time to earn these amounts during his sentence, even assuming Jones earns

18

nothing more than the minimum. (At $12 a month, Jones will have earned $720 after five years, $300 of which will be deducted to pay for the restitution fine, leaving $420 to pay the remaining $70.) In our view, this forecloses a meritorious inability to pay argument. (See *People v. Hennessey* (1995) 37 Cal.App.4th 1830, 1837 [court may consider ability to earn prison wages in determining ability to pay].) Accordingly, on this record, we conclude that the *Dueñas* error was harmless. (See also *People v. Johnson*, *supra*, 2019 Cal. App. LEXIS 426, at *7 ["The idea that [defendant] cannot afford to pay $370 while serving an eight-year prison sentence is unsustainable."].)

### III. DISPOSITION

The judgment of conviction is affirmed. The trial court is directed to modify the abstract of judgment to indicate the imposition of the assessments and restitution fine and forward a copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation.

CERTIFIED FOR PARTIAL PUBLICATION

RAPHAEL
J.

We concur:

MCKINSTER
Acting P. J.

MILLER
J.

19