Filed 6/15/23 P. v. Sierra CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B316427 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA466498) |
| v. | |
| LARRY SIERRA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Mark S. Arnold, Judge. Affirmed.

Patricia A. Scott, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan S. Pithey, Assistant Attorney General, Scott A. Taryle and Stefanie Yee, Deputy Attorneys General, for Plaintiff and Respondent.

_____

# INTRODUCTION

Larry Sierra appeals from his judgment of conviction of one count of first degree murder of Claudia Garcia (Pen. Code,[1] § 187, subd. (a)) and discharging a firearm in the commission of the murder (§ 12022.53, subds. (b)–(d)). On appeal, Sierra contends the prosecutor committed prejudicial misconduct by making a correction to the transcript of a recorded jailhouse conversation between Sierra's codefendant and an undercover agent just before the transcript and audio recording were presented to the jury. Sierra also claims that the prosecutor committed prejudicial misconduct during closing argument when he commented that counsel for Sierra's codefendant recognized that the evidence against Sierra was overwhelming. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. Prosecution Evidence

#### A. Sierra and Garcia's Relationship and Sierra's Prior Threats Against Garcia

Garcia's family and friends testified for the prosecution regarding Sierra's abusive relationship with Garcia. Garcia's mother, Maria Garcia,[2] described the relationship of Garcia and Sierra as "very bad." On one occasion, Maria found Garcia hiding in a mechanic shop after Sierra had hurt Garcia and was following her on the street. On another occasion, she saw Garcia's eyes were "very bruised." On December 24, 2017, Sierra

---

[1] All further statutory references are to the Penal Code.

[2] For the sake of clarity and to avoid confusion with Garcia, we refer to Garcia's mother by her first name, intending no disrespect.

2

went to Maria's house and threatened Garcia, yelling at her from the street.

Likewise, Garcia's daughter described the relationship of Garcia and Sierra as "very toxic" and "abusive." She witnessed Sierra physically abuse and threaten Garcia multiple times. This included one occasion in 2017 when Sierra uppercut Garcia with a closed fist, leaving a scar on her chin. In 2014, Sierra threatened Garcia and pointed a handgun at her body through a metal screen door while her daughter was standing beside her.

Garcia and Sierra had a child together, Larry S. While Garcia was pregnant with Larry S., Sierra threatened her, pointing a knife at her stomach because he did not believe Larry S. was his child. After Larry S. was born, Sierra's mother and Maria shared joint custody of the child. However, because Sierra repeatedly threatened Garcia and Maria, telling them to stay away from Larry S., Maria allowed Larry S. to live with Sierra and his mother on 85th Street near Broadway in Los Angeles. Maria testified there were always problems when Garcia would try to visit Larry S., and that Sierra would refuse to open the door whenever Garcia tried to visit Larry S. About two or three weeks before Garcia's murder, she asked Maria to accompany her to visit Larry S. because Sierra had threatened to kill her if she did so. When they arrived at Sierra's mother's house, Sierra came outside and threatened Garcia, calling her a "bitch," and saying that she was "gonna get it."

Chantel Keuleman was Garcia's roommate. Sierra would sometimes communicate with Garcia by texting Keuleman's cell phone. A couple months before Garcia's murder, Sierra sent messages to Keuleman threatening to kill Garcia because he believed that Garcia was dating another man. In one text

3

message, Sierra wrote, " 'You tell Claudia to stay with her other'—N-word—'ese. When I . . . see her in L.A., it's on, ese.' " Keuleman characterized this text message as Sierra being "respectful," and that he generally used language that was much worse. On the day of the murder, Garcia told Keuleman that she was going to visit Larry S. near 84th Street and Broadway at Sierra's and his mother's residence.

Jennifer Batson was Garcia's friend. In the weeks leading up to her murder, Batson saw that Garcia was receiving threatening texts from Sierra and that she looked like she had been beaten because her legs, stomach, and side were bruised. On the day of the murder, Batson and Garcia were attending court together in downtown Los Angeles. Batson testified that Garcia received a threatening text message from Sierra that day and that she was very concerned for Garcia because of Sierra's behavior.

### B. Law Enforcement Investigation

Garcia was found shot to death at a bus stop near 83rd Street and Broadway, approximately one block from Sierra's residence. Detective Iris Romero recovered a cell phone, a bus token, and a monthly planner near Garcia's body. No cartridge casings were found at the scene, suggesting that the casings had been moved or the murder weapon was a revolver, which does not expel the casings upon being fired.

Detective Romero obtained surveillance camera footage from a nearby liquor store and a medical marijuana dispensary. In the surveillance footage, Garcia can be seen walking away from the area of Sierra's home at 8:16 p.m. and stopping at the bus stop. Several minutes later, a van with distinctive logos drives past the bus stop where Garcia is waiting and parks at the

4

corner of 83rd Street and Broadway. Then, a heavyset man gets out of the van, approaches Garcia, and shoots her in the back. The shooter then runs back to the parked van, which drives off.

Investigators identified the logos on the van and determined the van was connected to a car audio business in Hawthorne. The business owner testified that he had hired both Sierra and Sierra's cousin and codefendant, Benito Venegas, and that he allowed Venegas to use the company's van on the weekends so that Venegas could drive it to promote the business.

In examining the cell site activity for Venegas's cell phone on the day of the murder, the data showed that Venegas called Sierra's home at 6:47 p.m. Then, Venegas called Sierra again at 8:24 p.m. and 8:27 p.m. from a cell site near the crime scene and Sierra's residence. From 8:40 p.m. to 8:42 p.m., Venegas's cell phone activity moved away from the crime scene, and towards Venegas's residence.

Sierra and Venegas were arrested three days after the murder and the van was impounded.

### C. *Perkins* Operation

In a *Perkins* operation, Detective Jason Archie placed an undercover agent in a holding cell with Venegas and recorded their conversation. (*Illinois v. Perkins* (1990) 496 U.S. 292 (*Perkins*).) After Venegas and the agent spoke for several minutes, Detective Archie told Venegas that he wanted to talk about Garcia's murder. At some point during Venegas's conversation with the agent, Detective Archie walked Sierra and Sierra's younger brother past Venegas's cell, so that Venegas and the agent could see them. Venegas told the agent that Sierra was his cousin.

During their recorded conversation, Venegas admitted to the undercover agent that he picked up Sierra on the day of the murder, and Sierra directed him where to go. According to Venegas, Sierra "got out the car, he ran over there, I just heard ba—ba—ba—ba. He came running back to the car and we took off." Venegas told the agent that he did not know what Sierra was going to do. When the agent suggested that Sierra might be cooperating with law enforcement, Venegas said that if Sierra did so, Sierra would be "green[lit]," i.e., killed for cooperating with police. After the agent suggested to Venegas that law enforcement may have surveillance footage of the murder, Venegas admitted, "[t]here's a smoke shop right there," and "I fucked up because I busted a bitch, [unintelligible] you know." Venegas told the agent that he should have "burned" the van after the murder because of its distinct logos tying the van to his employer. When the agent suggested that investigators were going to search the van for bullets, Venegas said that they would not find anything, but that he "fucked up" because the bullet casings were hidden in a deodorant stick at his house. When the agent asked how Venegas had time to find and collect the bullet casings, Venegas said that the murder weapon was a .357 revolver.[3] Venegas said he also hid the sweater Sierra was wearing on the night of the murder in a pile of his sister's clothes, but that his sister was unlikely to cooperate with law enforcement.

Venegas and the agent also discussed the potential sentences for murder. The agent informed Venegas that

---

[3] Detective Archie later searched Venegas's home and found three spent .357 casings hidden in a stick of deodorant.

"an accomplice is still just as fucked as the main one that shoots the fucking strap." Venegas responded, "That's gonna be life, huh?" When the agent told Venegas that the shooter would do life, Venegas asked, "I'm looking at 15, for the driver?" Before the agent was taken from the holding cell, he told Venegas, "You shoulda just never answered your cousin's call that night. You know, you should have told him, I'm busy. I'm working or something."

## II. Defense Evidence

Sierra introduced fingerprint processing cards and fingerprint lift tapes that were collected and analyzed in relation to the investigation of Garcia's murder.

## III. Jury Verdict and Sentencing

The jury found Sierra guilty of first degree murder, and found the firearm allegation true. The same jury found Venegas not guilty of murder but found him guilty of being an accessory after the fact. Sierra waived jury trial on a prior conviction allegation, and the court found it true. Sierra was sentenced to 80 years to life. Sierra appealed.

## DISCUSSION

## I. Sierra Cannot Establish That He Was Prejudiced by the Prosecutor's Revision of the *Perkins* Audio Transcript

Sierra first argues that the prosecutor committed misconduct by altering the transcript of the *Perkins* operation just before it was presented to the jury without first informing counsel, and then referencing the altered portion of the transcript in his closing argument. Sierra asserts that the trial court should have granted his motion to dismiss based on the prosecutor's alterations to the transcript.

### A. Additional Background

The prosecution first produced the audio of the *Perkins* operation along with a rough transcript of the recording in approximately July 2018. Thereafter, Sierra introduced the audio recording as an exhibit at his preliminary hearing.

Before trial, Sierra moved to exclude the recording on the grounds that it was inadmissible hearsay. The trial court denied the motion, but the parties agreed to exclude certain portions of the audio that referred to gang membership. On the morning the audio was to be played to the jury, the prosecutor removed those agreed upon portions of the transcript, and sent an updated copy of the transcript to defense. The prosecutor noted in his email that he was going to listen to the audio one more time to make sure everything was right. When trial resumed, the prosecutor gave defense counsel another updated copy of the transcript, noting that he had made changes to parts of the transcript that had been previously marked unintelligible, and asked defense counsel to review it. Copies of the transcript were also distributed to the jury, and the audio recording was played. The accompanying transcript included the sentence, "You shoulda just never answered your cousin's call that night. You know, you should have told him, I'm busy. I'm working or something." In the previously produced rough transcript, that particular statement had been marked as unintelligible. Sierra's counsel did not object to the statement when it was played to the jury.

Two days later, the prosecutor referred to the sentence in his closing argument: "What else do we know? The informant says, 'You should have just never answered your cousin's call that night.' Well, in reality we know it was Venegas who called Sierra. And Venegas says, 'I was tripping out in the room. I was

8

like fuck what the fuck happened, bro.' So, again, this is an adoptive admission that the person he was with that night was who? His cousin." Again, Sierra did not object to the statement during the prosecutor's closing argument.

After the case was submitted to the jury, Sierra moved to dismiss the case based on the prosecutor's inclusion of this statement in the transcript and the prosecutor's closing argument. The jury deliberated for approximately one hour before reaching a verdict. The trial court held a hearing on the motion after the jury indicated that it had reached a verdict. Sierra argued that the prosecutor should have notified defense counsel of the revisions so that their admissibility could have been litigated. The prosecutor explained that he had informed defense counsel that he revised parts of the transcript that were previously marked unintelligible, and that he told defense counsel to review the changes. Moreover, the prosecutor noted that Sierra's counsel did not object to the statement when the recording was played to the jury, and that the audio recording, which was the actual evidence, had been available to the defense for over three years. Defense counsel admitted that he "half listened" when the audio was played for the jury, and that the first time he noticed the added language was when the prosecutor referenced it during his closing argument.

The trial court listened to the disputed portion of the audio recording and found that the challenged portion could be heard "clear as a bell" and that the prosecutor's revision was accurate, finding that "it's very plain that's exactly what was said." The trial court further found that, even had the challenged language been litigated, it would have been admitted as an adoptive admission similar to other portions of the recording that had been

9

litigated and deemed admissible.  Accordingly, the trial court denied the motion to dismiss.

## B.    Governing Law

The federal and state standards to assess prosecutorial misconduct are " 'well established.' " (*People v. Hill* (1998) 17 Cal.4th 800, 819.)  A prosecutor commits misconduct when his or her behavior comprises a pattern of conduct " ' "so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process." ' " (*Ibid.*)  Under state law, a prosecutor commits misconduct when it involves " ' " 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' " ' " (*Ibid.*)  A defendant's conviction will not be reversed for prosecutorial misconduct "unless it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct." (*People v. Crew* (2003) 31 Cal.4th 822, 839.)

We review a trial court's denial of a motion to dismiss criminal charges for abuse of discretion.  (*People v. Velasco-Palacios* (2015) 235 Cal.App.4th 439, 445 (*Velasco-Palacios*).)

## C.    Analysis

Even if we assume that the prosecutor's revisions to the transcript were inappropriate, Sierra cannot show that, had the prosecutor specifically informed him of the corrected transcript, the trial court would have excluded the statement, or that he would have obtained a more favorable outcome at trial.  First, Sierra does not contend that the prosecutor's revisions to the audio transcript were inaccurate or fabricated.  Indeed, when the trial court listened to the disputed portion of the audio recording, it found that the revised transcript was accurate and that the specific lines complained of by Sierra could be heard "clear as a

bell." "Transcripts of admissible tape recordings are only prejudicial if it is shown they are so inaccurate that the jury might be misled into convicting an innocent man." (*People v. Brown* (1990) 225 Cal.App.3d 585, 599.) Moreover, Sierra cannot show that the statement would have been excluded. The trial court rejected Sierra's argument that the statement was inadmissible hearsay, finding that Venegas's response was an adoptive admission.

Further, Sierra cannot establish prejudice because the remainder of the audio recording, which was deemed admissible after being litigated by the parties, overwhelmingly supported Sierra's guilt. Even without the statement, "You shoulda just never answered your cousin's call that night," it was apparent that Venegas was referring to Sierra throughout his conversation with the agent. While Venegas was in the cell with the agent, Detective Archie walked Sierra past to help stimulate conversation. Venegas expressed skepticism that Sierra was cooperating with law enforcement, noting, "Nah, he's my [cousin] holmes." Venegas told the Perkins agent, "I picked him up and then he's like, turn right here. [¶] . . . [¶] . . . [r]ight there. [¶] . . . [¶] He got out of the car, he ran over there, I just heard ba—ba—ba—ba. He came running back to the car and we took off." The Perkins agent asked, "So, who—it was—it was just you two by yourself?" Venegas responded "Uh-huh." The agent also confirmed with Venegas that he was talking about Sierra rather than Sierra's brother, who was also detained as part of the investigation, identifying Sierra by his tattoos, age, and body type. Further, when the agent suggested Venegas had the most to lose because Venegas had a job, Venegas responded that Sierra was working with him at the car audio business, which was

confirmed by the business owner's testimony. Thus, in context, it is obvious, even without the challenged statement, that Venegas was referring to Sierra when he described the circumstances of the murder to the agent.

Lastly, the other evidence against Sierra clearly established his guilt. The surveillance footage showed a man matching Sierra's physique shoot Garcia in the back after he got out of a vehicle matching a van owned by Sierra's and Venegas's employer, which Venegas had access to on the day of the murder. Venegas's cell phone activity showed that he was in contact with Sierra just before the murder and that he was in the area of the crime scene in the minutes just before and after the shooting. There was also Sierra's history of threatening to kill Garcia and his physical abuse in relation to her visits with Larry S., which is precisely where Garcia was coming from when she was murdered at a bus stop a block away from Sierra's residence. This evidence was uncontroverted and supported by multiple witnesses, surveillance footage, cell phone location data, and text messages. The jury's short deliberation, which lasted just over an hour, supports the conclusion that this was not a close case.

We also reject Sierra's claim that he was prejudiced because the statement specifically implicated Sierra as the planner and shooter, and defense counsel had not planned for this in preparing a defense. As discussed above, the entirety of the audio recording supported the conclusion that Sierra was the shooter, and that Venegas drove him to the crime and helped Sierra hide evidence after the fact. Sierra's argument that he was unprepared for this theory rings hollow when he had access to the audio recording for over three years.

Sierra argues that this case is akin to *Velasco-Palacios*, *supra*, 235 Cal.App.4th 439. In *Velasco-Palacios*, the trial court granted the defendant's motion to dismiss on the grounds that the prosecutor engaged in outrageous government conduct. (*Id.* at p. 444.) There, the prosecutor fabricated and added two additional lines to a translation of defendant's police interrogation. (*Id.* at pp. 442–443.) The fabricated lines of the transcript were essentially an admission of guilt to a more serious crime that the prosecutor attempted to use as leverage against the defendant to accept a plea. (*Id.* at p. 442.) When defense counsel confronted the prosecutor about the fabricated portions of the transcript, the prosecutor admitted that he added the lines "in jest," and later testified that the added lines were "a joke." (*Id.* at p. 443.) The trial court dismissed the charges, finding that, even if the lines were added as a joke, the dissemination of a fraudulent confession during plea negotiations was egregious, outrageous, and shocked the conscience. (*Id.* at p. 444.) The reviewing court affirmed the dismissal, concluding that the prosecutor deliberately altered the transcript to justify charges that could carry a life sentence and distributed the transcript to defense counsel when he knew that the defense was trying to settle the case. (*Id.* at p. 447.)

The circumstances in *Velasco-Palacios* are a far cry from what occurred here. Unlike the prosecutor in *Velasco-Palacios*, the prosecutor here did not fabricate evidence to force a plea deal. Indeed, Sierra, the prosecutor, and the trial court all agree that the prosecutor's alterations were an accurate transcription of the recording. Sierra's insistence that the timing of the belated revisions to the transcript were essentially "sandbagging" is not supported by the record as Sierra and his counsel had access to

13

the recording, which contained the challenged statements that could be heard "clear as a bell" for over three years.

Because Sierra cannot show that he was deprived of due process, or that he would have obtained a more favorable outcome had he been notified of the challenged statement, he cannot establish prejudice. Therefore, his claim is denied.

## II.   The Prosecutor's Comments on Codefense Counsel's Closing Argument Did Not Constitute Misconduct

Sierra next argues that the prosecutor committed misconduct when he commented during closing argument that Venegas's counsel recognized the overwhelming evidence against Sierra. Again, we disagree.

### A.   Additional Background

During closing argument, Venegas's counsel argued that, while the evidence tended to show that Venegas drove Sierra to the murder and hid evidence after the fact, there was no evidence that Venegas knew Sierra was going to commit the murder or that he was involved in the murder itself. Venegas's counsel thus essentially conceded that Venegas and Sierra were present at the scene, but argued that Venegas was not guilty of murder because he did not know that Sierra was going to shoot Garcia. In contrast, Sierra's counsel's primary contention at closing was that the prosecutor had not met his burden of proof, and that it was likely that Garcia was shot by an unknown third party, who intimidated Venegas into assisting him or her in the murder.

During rebuttal, the prosecutor commented on the inconsistencies between Venegas's and Sierra's defenses. "Let's just quickly look at what the defense is. Well, they didn't put on a defense. Their defense is essentially that I didn't meet the burden of proof. There was no testimony from the defense. They

14

were saying the district attorney's office came up short. Larry Sierra specifically saying it wasn't me and [Venegas] saying he didn't know. [¶] . . . So the defenses aren't completely in sync, right? [Venegas] saying it was my cousin. I yelled . . . afterwards what the fuck happened, but I didn't know. Sierra's attorney saying he's saying something completely different. That Larry Sierra wasn't in the car at all. So their defenses are not consistent. [¶] But [Venegas's] attorney recognizes that the evidence against Larry Sierra as the shooter is overwhelming."

Following the prosecutor's statement, Sierra's counsel objected and asked for a sidebar, which the trial court denied. After the conclusion of closing argument, the trial court allowed the parties to argue the objection. Sierra moved for a mistrial, arguing that the prosecutor's comment improperly "boot-strapped" Venegas's counsel's argument and concessions to bolster the prosecution's case against Sierra.

The trial court denied the motion for mistrial, finding that the prosecutor was merely commenting on the evidence, which overwhelmingly supported Sierra's guilt.

### B. Governing Law

During closing argument, a "prosecutor is given wide latitude to vigorously argue his or her case and to make fair comment upon the evidence, including reasonable inferences or deductions that may be drawn from the evidence." (*People v. Ledesma* (2006) 39 Cal.4th 641, 726.) While a prosecutor is not allowed to make false or unsubstantiated accusations that counsel is fabricating a defense or deceiving the jury, he or she has broad discretion to describe the deficiencies in opposing counsel's tactics. (*People v. Bemore* (2000) 22 Cal.4th 809, 846.)

15

A prosecutor may permissibly criticize the defense counsel's argument. (*People v. Marquez* (1992) 1 Cal.4th 553, 575–576.)

### C. Analysis

The prosecutor's comment that Venegas's attorney recognized the overwhelming evidence against Sierra or that the counsel's theories were inconsistent was not misconduct. As discussed above, that was an accurate assessment of the evidence against Sierra, as well as Venegas's counsel's closing argument. Throughout his argument, Venegas's counsel acknowledged that the evidence of Sierra's and Venegas's involvement in the crime was so overwhelming that the only available defense was that Venegas did not know that Sierra intended to kill Garcia. Thus, the prosecutor's comments were squarely based on the evidence and responsive to both Sierra's and Venegas's counsel's closing arguments. It is not misconduct for the prosecutor to comment on the "persuasive force of defense counsel's closing argument . . . ." (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1155), and generally, there will be no misconduct where comments focus the jury on the evidence rather than distracting it from its task (*People v. Redd* (2010) 48 Cal.4th 691, 735).

Sierra argues that the prosecutor's comment was arguing facts not in evidence, and that it improperly bolstered the credibility of the prosecution's witnesses. Sierra is incorrect. The prosecutor's reference to the inconsistent defenses was an appropriate response to the defense's arguments and was based on the state of the evidence presented at trial.

Accordingly, we find that the prosecutor's comment regarding Venegas's counsel's closing argument was not misconduct and thus not grounds for a mistrial.

16

## DISPOSITION

The judgment is affirmed.

                                         VIRAMONTES, J.

We concur:

GRIMES, Acting P. J.

WILEY, J.

17